## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ABEONA THERAPEUTICS, INC.,   ) | |
|                     ) | |
|       Plaintiff,          ) | |
|                     ) | |
|       v.                ) | Case No. _____ |
|                     ) | |
| EB RESEARCH PARTNERSHIP,   ) | |
| INC., AND EPIDERMOLYSIS      ) | |
| BULLOSA MEDICAL            ) | |
| RESEARCH FOUNDATION,     ) | |
|                     ) | |
|       Defendants.       ) | |

## COMPLAINT

Plaintiff Abeona Therapeutics, Inc. ("Abeona"), by and through its undersigned counsel, Morgan, Lewis & Bockius, LLP, states its complaint for declaratory and injunctive relief against defendant EB Research Partnership, Inc. ("EBRP"), and Epidermolysis Bullosa Medical Research Foundation ("EBMRF") (collectively "Defendants"), as follows:

## NATURE OF THE ACTION

1.      Abeona, a biopharmaceutical company, seeks (a) a declaratory judgment that it is not required to arbitrate a dispute with EBRP, (b) preliminary and permanent injunctions enjoining EBRP from proceeding with the arbitration it has commenced ("the Arbitration"), and (c) an order requiring Defendants to return the stock Abeona issued to them or, to the extent they have sold any of that stock, to pay Abeona its value in damages.

2.      The arbitration clause under which EBRP seeks to arbitrate is not enforceable because the contract that contains it is illusory and void *ab initio* for lack of consideration: on its face, the contract's sole purpose was to give Abeona the right to certain technology in which

Defendants represented they had rights, but in which they actually had no rights, and Defendants gave no other consideration for the Agreement.

3.     Because no contract was ever formed, the arbitration clause cannot be enforced.

4.     And because no contract was ever formed, Defendants should return the stock Abeona issued to them under the Agreement, or its value, to the extent they have sold any of that stock.

## THE PARTIES

5.     Abeona is a Delaware corporation with its principal place of business in Cleveland, Ohio, and an office in New York, New York.

6.     EBRP is a New York not-for-profit corporation whose principal office is in New York, New York.

7.     EBMRF is a California not-for-profit corporation whose principal office is in Los Angeles, California.

## JURISDICTION AND VENUE

8.     This is an action for a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §2201 *et seq.*, and Rule 57 of the Federal Rules of Civil Procedure, and for preliminary and permanent injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

9.     The Court has subject matter jurisdiction under 28 U.S.C. §1332 because the parties are of diverse citizenship and the amount in controversy, exclusive of interest and costs, exceeds $75,000.  Specifically, EBRP seeks to arbitrate Abeona's purported obligation to issue, and to lift restrictions on, stock whose value is well in excess of $75,000.

10.     The Court also has subject matter jurisdiction because this action arises under the Federal Arbitration Act, 9 U.S.C. §4.

11.     The Court has personal jurisdiction over EBRP because EBRP is incorporated under the laws of New York and has its principal place of business in New York, and because EBRP entered into the Agreement with Abeona, which provided that the forum for resolution of disputes would be New York.

12.     The Court has personal jurisdiction over EBMRF because EMBRF entered into the Agreement with Abeona, which provided that the forum for resolution of disputes would be New York.

13.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because a substantial part of the events giving rise to this action occurred within this judicial district, including but not limited to EBRP's acting in New York, New York, and through its New York counsel, to commence the Arbitration.

## FACTUAL BACKGROUND

14.     Defendant EBRP is a non-profit entity involved in the funding of research directed at the treatment of epidermolysis bullosa (EB), a rare skin condition.

15.     In exchange for the funding EBRP provides towards such research, it often seeks to obtain the right potentially to participate in, and obtain a financial return from, the commercialization of the EB research it funds.  EBRP has referred to its approach toward the funding of EB research as "venture philanthropy."  EBRP frequently seeks a financial stake in the research it funds.  For example, and as EBRP's website makes clear, in exchange for funding research at an institution, EBRP may obtain from that institution the contractual right to direct to

whom the institution licenses the technology resulting from the research, and to participate and benefit financially from the commercialization of that technology.

16.     Abeona is a clinical-stage biotechnology company that is dedicated to developing novel biotechnology therapies for rare genetic diseases.

17.     Much of Abeona's business involves licensing technology from academic institutions or businesses and seeking to develop therapies using that technology.

18.     In the fall of 2015, Abeona announced agreements to license two potential drug therapies from academic institutions:  one from the University of Minnesota; and another from the Leland Stanford Junior University ("Stanford").

19.     At that time, EBRP was funding research at the University of Minnesota through its foundation.

20.     A representative of the University of Minnesota asked Mark Ahn, a consultant to Abeona, to speak to Alex Silver, the founder of EBRP, because, in exchange for funding research at the University of Minnesota, Silver had obtained for EBRP the contractual right to determine to whom the intellectual property resulting from that research would be licensed.  The University of Minnesota encouraged Ahn to communicate with Silver to confirm that the intellectual property Abeona was licensing from the University of Minnesota was distinct from the intellectual property involved in the research EBRP was funding there.

21.     The communications between Silver and Ahn led both to conclude that EBRP did not have any contractual rights respecting the intellectual property that Abeona was licensing from the University of Minnesota.

22.     As a result, Abeona did not commit to compensate EBRP in any way, whether with money or equity, in connection with Abeona's licensing of the intellectual property from

the University of Minnesota. Had EBRP had a contractual right respecting the licensing of that technology, Silver made clear that he would have negotiated for some compensation for EBRP in exchange for its consent to Abeona licensing that intellectual property.

23.     During their conversation, Ahn and Silver also discussed other research EBRP was funding at Stanford and EBRP's desire to find corporate partners to move that technology from academic research to company drug development. Silver was interested in Abeona licensing that technology, and in EBRP obtaining compensation in connection with Abeona doing so.

24.     Silver represented to Abeona that EBRP used a "venture philanthropy" model, under which EBRP agreed to fund research into a potential treatment for EB, in exchange for obtaining from the educational institution that performed such research the contractual right to direct to which company or companies the intellectual property involved in that research would be licensed.

25.     As part of those discussions, Silver sought to interest Abeona in the licensing of intellectual property arising from research EBRP claimed to have funded for the treatment of EB, which included LZRSE-Col7A1 Engineered Autologous Epidermal Sheets ("LEAES" or "EB-101") and AAV DJ COL7A1 homologous recombination ("AAV DJ COL7A1" or "EB-201").

26.     Silver told Ahn that EBRP had invested over $5 million in that technology.

27.     Silver also told Ahn and Abeona's Executive Chairman, Steven Rouhandeh, both in person at Silver's office and also in telephone calls, that EBRP, as the funding source for the Stanford research, had the contractual right to direct that EB-101 technology to a licensee of its choosing. Silver was interested in Abeona licensing that research and obtaining for EBRP a

financial return in exchange for EBRP exercising the contractual right it claimed it had to direct the licensing of that research.

28.     Abeona was interested in obtaining the right to license and develop EB-101 and EB-201 technology to treat EB, and it began negotiating a business arrangement with EBRP, on the basis of EBRP's representations that it had the contractual right to direct the licensing of that technology at Stanford.

29.     Abeona and EBRP initially considered entering into an arrangement under which Abeona would create a subsidiary (which they referred to during their negotiations as "NEWCO" or "EvoDerm") to develop the technology.  They proposed that EBRP would receive 33.3% of the stock in the subsidiary, in exchange for directing the licensing of the technology to the Abeona subsidiary and raising $4 million in funding that would go towards financing operations of the new company.

30.     EBRP, however, was unable to raise the $4 million, and the parties abandoned the concept of joint ownership of a new Abeona subsidiary.

31.     Instead, Abeona and EBRP agreed to bring the EB-101 and EB-201 product candidates into Abeona by an agreement under which EBRP would direct the technology rights to Abeona under a license agreement with Stanford in exchange for EBRP receiving stock that Abeona would issue.

32.     During their negotiations, Abeona and EBRP exchanged and revised multiple drafts of their proposed agreements, initially for the NEWCO/EvoDerm business structure that they ultimately abandoned, and later for the agreement they actually entered.  Every one of the draft agreements included – prominently on its **first** page – the representation that EBRP has the "contractual right" to license the EB-101 technology.

33.     Thus, the first draft agreement that was exchanged between Abeona and EBRP on December 31, 2015 relating to the (ultimately abandoned) agreement relating to the NEWCO/EvoDerm arrangement provided as follows:

> **EBRP has the contractual right to license** from the Board of Trustees of the Leland Stanford Junior University (i) **EB101** (LZRSE-Col7A1 Engineered Autologous Epidermal Sheets (LEAES)) and (ii) AAV-based gene therapy EB-201 (AAV DJ COL7A1) **and wishes to have Abeona, acting through EB NewCo, to exercise such right and take a license from The Board of Trustees of the Leland Stanford Junior University** for such technology and perform preclinical development and perform clinical trials of a gene therapy treatment for Epidermolysis Bullosa based upon such in-licensed technology, and Abeona and EBRP see a mutually beneficial opportunity to collaborate with respect to the development and introduction of treatments for Epidermolysis Bullosa.

(Emphasis added.)  A true and correct copy of the December 31, 2015 draft is attached hereto as Exhibit A.

34.     EBRP's counsel sent Abeona's counsel a redlined version of the draft NEWCO/EvoDerm arrangement on January 13, 2016 (a true and correct copy of which is attached hereto as Exhibit B).  In the draft, EBRP's counsel included the draft language that is quoted in ¶31 above, and added the assertion that EBRP **also** had "the **contractual right to license** from the University of Minnesota … and together with Stanford … Talen-based gene correction technology for type VII collagen (TALEN)…."  *Id.* (emphasis added).

35.     Neither EBRP nor its counsel informed Abeona, or any representative of Abeona, that EBRP did not possess the "contractual right" that the draft agreement stated EBRP possessed respecting the research being performed at Stanford.  Although EBRP did, in fact, have the contractual right it claimed it had to research that it had funded at the University of Minnesota, contrary to its representation that EBRP's counsel inserted into the above-referenced draft agreement, EBRP did not have any contractual right respecting the Stanford research.

36.     On February 2, 2016, Abeona's counsel sent EBRP's counsel by email a redlined version of the draft NEWCO/EvoDerm agreement.  A true and correct copy of the email and agreement are attached hereto as Exhibit C.

37.     Abeona's counsel stated in the February 2, 2016 email that "EvoDerm is not licensing the UMinn technology," *i.e.*, the TALEN technology, and that "[t]here will be 2 separate license agreements with Stanford for the 2 different Stanford technologies.  **EBRP only funded one of these technologies (EB-101)** not both of them."  *See* Exhibit C (emphasis added).

38.     The redlined version of the NEWCO/EvoDerm draft agreement that Abeona's counsel sent to EBRP's counsel on February 2, 2016, included the following provision, which removed the representation that EBRP had contractual rights to the EB-201 technology, but retained the representation that EBRP had contractual rights to the EB-101 technology; and it stated as follows:

> EBRP has the **contractual right to license from** The Board of Trustees of [**Stanford** University] **EB-101** (LZRSE-Col7A1 Engineered Autologous Epidermal Sheets (LEAES)), and **wishes to have Abeona**, acting through newly formed EvoDerm (a special purpose company formed for the purposes hereinafter provided), to **exercise such rights** and enter into a license with Stanford for such technology …. Abeona, acting through EvoDerm shall also enter into a license with Stanford for the AAV-based gene therapy EB-201 (AAV DJ COL7A1) technology in the form of the license agreement attached to this Agreement as Attachment 7….

*See* Exhibit C (emphasis added).

39.     On February 26, 2016, and again on March 3, 2016, EBRP's counsel and Abeona exchanged versions of the NEWCO/EvoDerm draft contract (attached hereto as Exhibits D and E, respectively) that included the following language, on the first page:  "EBRP has the **contractual right to license from [Stanford** University] **EB-101** (LZRSE-Col7A1 Engineered Autologous Epidermal Sheets (LEAES))…."

8

40.     Neither EBRP nor its counsel informed Abeona, or any representative of Abeona, that EBRP did not possess the "contractual right" that the draft agreement stated EBRP possessed.

41.     In an email to Abeona dated March 2, 2016 (attached hereto as Exhibit F), EBRP's founder Silver stated that under the proposed NEWCO/EvoDerm arrangement, "you [Abeona] have **our best IP**...." (Emphasis added.)

42.     In fact, EBRP had no contractual rights of ownership or any other type of contractual right relating to the intellectual property referenced in Silver's email dated March 2, 2016, which Silver described therein as "our best IP." *Id.*

43.     In June 2016, after EBRP notified Abeona that it could not raise the money to contribute $4 million to NEWCO/EvoDerm, the parties began negotiating the agreement that they ultimately entered, which contemplated that Abeona would issue stock to EBRP and EBMRF, given their supposed status, per Silver's representations, as "co-owners" of the intellectual property with the right to direct to whom it would be licensed.

44.     The drafts of the new agreement all included the same representation that EBRP had the "contractual right" to license the EB-101 technology from Stanford.  *See* Exhibit G (drafts of ultimate agreement and transmittal emails).

45.     Defendants were aware that the final draft of the agreement, like many prior drafts of proposed agreements with Abeona, contained the reference to the supposed contract right that EBRP and Silver, and their counsel, repeatedly represented that Defendants had respecting the licensing of the referenced technology.  Indeed, in an email dated July 8, 2016, EBRP's founder Silver stated he had "gone through" the latest (and nearly final) draft of the agreement, and he

noted that "EBMRF needs to be added as a signatory. **EBRP/EBMRF co-own IP.**" *See* Exhibit G (at page 47 of 114) (emphasis added).

46.     Contrary to Silver's representation in his July 8 email, neither EBRP nor EBMRF owned the IP referenced in the draft agreement.

47.     On July 9, 2016, Abeona's counsel asked EBRP by email (a true and correct copy of which is attached as Exhibit H) the following question:

> What Stanford technology does EBMRF have rights with respect to? Is it both the EB101 LEAS technology and the recombinant type VII (rC7) protein replacement therapy technology? Or is it just one of those technologies?
>
> The document currently reads in terms of EBRP alone having rights to direct those technologies but it is fairly important that Abeona and the document have a clear statement on whether its EBRP alone or EBRP and EBMRF together that hold that right.

48.     On July 9, 2016, EBRP's founder Silver responded to Abeona's counsel's question by email: "EBRP/EBMRF are **co-owners** and funders in this project. Pls adjust docs if that is not reflected[.]" (Emphasis added.) *See* Exhibit H. EBMRF, like EBRP, is involved in funding research for technologies to treat EB.

49.     At the time Silver sent the July 9, 2016 email referenced above, neither EBRP nor EBMRF were co-owners of the "project" referenced in that email, or of any research or intellectual property generated by that "project."

50.     Defendants never told Abeona they did not have the contract right they represented they had respecting the licensing of the referenced technology. To the contrary, Defendants told Abeona that they did have that right, just as the final version of the contract so states.

51.     In July 2016, Abeona, EBRP, and EBMRF signed a written document titled "Agreement," a true and correct copy of which, exclusive of its attachments, is attached hereto as Exhibit I (the "Agreement").

52.     The Agreement expressly provides that EBRP and EBMRF "have the contractual right to license" the EB-101 technology; as it states:

> EBRP and EBMRF **have the contractual right to license** from The Board of Trustees of the Leland Stanford Junior University ('Stanford') **EB-101** (LZRSE-Col7A1 Engineered Autologous Epidermal Sheets (LEAES)), and **wishes to have Abeona exercise such rights and enter into a license with Stanford for such technology** in the form of license agreement attached to this Agreement as Attachment 6, and perform preclinical development and perform clinical trials of a gene therapy treatment for Epidermolysis Bullosa based upon such in-licensed technology.

Exhibit I at page 1 (emphasis added).

53.     The Agreement also provides:

> Abeona shall also enter into a license with Stanford for the AAV-based gene therapy EB-201 (AAV DJ COL7A1) technology in the form of the license agreement attached to this Agreement as Attachment 7, and Abeona shall perform preclinical development and perform clinical trials of a gene therapy treatment for Epidermolysis Bullosa based upon such in-licensed technology.

*Id.*

54.     In connection with its business, Abeona pays for the right, from time to time, to license intellectual property, including from educational institutions. The research done by such educational institutions is often funded by outside sources, including charitable entities. Abeona never before paid to any entity, other than the owner of the intellectual property being licensed, any consideration in connection with the licensing of such intellectual property.

55.     Abeona only agreed to compensate Defendants in connection with the licenses it obtained from Stanford in reliance upon the many representations EBRP and Silver made that: (1) Defendants had a contract right to direct to whom the intellectual property would be licensed;

and (2) Defendants would grant their consent to Abeona licensing the research only in exchange for obtaining compensation from Abeona.

56.     The Agreement required Abeona to take a number of steps to develop gene therapy treatments for EB based on the EB-101 and EB-201 technology, including, among other things:  (a) developing a Research and Development Plan describing the objectives, design, method and statistical measurements of the clinical trial, and a schedule and budget for those efforts; (b) being "solely responsible for and us[ing] its Commercially Reasonable Efforts to conduct the Program in accordance with the Research and Development Plan and all Applicable laws"; (c) staffing the Research and Development Plan; (d) manufacturing the drug and other products for use in the clinical trial; and (e) preparing and filing with regulatory authorities all documents needed to conduct the program.  *See* Exhibit I at §2.

57.     The predicate for Abeona undertaking any obligations to Defendants was the representation by Defendants that they had contract rights to the technology referenced in the Agreement.

58.     The Agreement provided that if EBRP terminated the Agreement for Abeona's "breach of its diligence obligations under this Agreement," Abeona would grant EBRP a license in the products Abeona was developing under the Agreement.  *See* Exhibit I at §9.3(d).

59.     The predicate for Abeona's agreement to give to EBRP, under certain circumstances, a license to the products that Abeona might thereafter develop was the representation by Defendants that they had contract rights to the technology referenced in the Agreement.

60.     The Agreement provided that, within 10 days after the Agreement's Effective Date, Abeona would issue 500,000 unregistered shares of Abeona Common stock to each of

EBRP and EBMRF pursuant to a Stock Issuance Agreement, which was attached to the Agreement as Attachment 3.  (*See* Stock Issuance Agreement attached hereto as Exhibit J.)  All the shares of stock were subject to restrictions, which would lapse at different times set forth in §3.3 of the Agreement.  Exhibit I at §3.3.

61.     The predicate for Abeona's agreement to give that stock to Defendants was the representation by Defendants that they had contract rights to the technology referenced in the Agreement.

62.     The Agreement provided that the restrictions on an aggregate 250,000 shares would lapse on the first anniversary of the issue date, and that the restrictions on the additional aggregate 500,000 shares would lapse on the second anniversary of the issue date.  Exhibit I at §3.3(b).

63.     The Agreement provided that the restrictions on the remaining aggregate 250,000 shares would be lifted if Abeona entered into a license agreement with Stanford for certain recombinant type VII (rC7) protein replacement therapy technology within six months after the effective date of the Agreement.  Exhibit I at §3.3(b).

64.     Pursuant to the Agreement, Abeona issued 500,000 shares of common stock to EBRP and 500,000 shares to EBMRF on or about August 3, 2016.

65.     On August 3, 2016, 1,000,000 shares of Abeona common stock had a market value of nearly $3.4 million.  As of November 19, 2018, the market value of that stock was over $7.5 million.

66.     Abeona entered into license agreements with Stanford for the EB-101 and EB-201 technology on August 3, 2016.

67.     In an 8-K filing with the SEC dated August 9, 2016 (attached hereto as Exhibit

K), Abeona disclosed that it had entered into the Agreement with EBRP and EBMRF, and stated,

among other things:

> EBRP and EBMRF have the **contractual right to license from** The board of Trustees of
> Leland **Stanford** Junior University … **EB-101** (LZRSE-Col7A1 Engineered Autologous
> Epidermal Sheets (LEASES)), and **wishes to have Abeona exercise such rights and
> enter into a license with Stanford for such technology**, and perform preclinical
> development and perform clinical trials of a gene therapy treatment for Epidermyolysis
> Bullosa based upon such in-licensed technology.  Abeona shall also enter into a license
> with Stanford for the AAV-based gene therapy EB-201 (AAV DJ COL7A1) technology,
> and Abeona shall perform preclinical development and perform clinical trials of a gene
> therapy treatment for EB based on such in-licensed technology.

(Emphasis added.)  This disclosure tracked the recitation of that information contained in the

Agreement, which was based on what Defendants told Abeona about the contractual right they

represented they had.

68.     On February 3, 2017, the parties entered into an agreement that amended in

certain respects the Agreement and the Stock Issuance Agreement (the "Amendment") (the

Amendment is attached hereto as Exhibit L).

69.     The Amendment's first paragraph refers to the Agreement "pursuant to which

Abeona **acquired** certain **contractual rights held by EBRP** and EBMRF with respect to certain

technology." *See* Exhibit K (emphasis added).  EBRP and EBMRF did not hold the contractual

rights referenced in the Amendment, either when the Agreement was signed, when the

Amendment was signed, or at any other time.

70.     The Amendment provides that the parties "wish to enter" into the Amendment "to

extend the period during which Abeona may exercise its option rights with respect to certain

technology under the EB Agreement and to adjust the schedule upon w[h]ich restrictions shall

lapse in respect of certain shares under the Stock Issuance Agreement." *See* Exhibit L.

71.     The Amendment amends §3.3(b) of the Agreement to provide that the restrictions

on the stock Abeona issued under the Agreement "shall lapse with respect to an aggregate

300,000 shares [rather than the original 250,000 shares] on the first anniversary of the issue date;

and with respect to an additional aggregate 450,000 shares [rather than the original 500,000

shares] on the second anniversary of the issue date." *See* Exhibit L.

72.     The Amendment also amended §3.3(b) of the Agreement to extend the time on

which the restrictions on 166,667 shares shall lapse in the event Abeona enters into an agreement

with Stanford for the license of certain recombinant type VII (rC7) protein replacement therapy

technology. *See* Exhibit L.

73.     EBRP sold some of the Abeona shares that Abeona had issued it under the

Agreement.

74.     In late 2017, Stanford informed EBRP's founder Silver that Abeona's public

disclosures were incorrect, and that EBRP and EBMRF do not have contractual rights in the EB-

101 technology nor the right to direct the technology, and that they never did.

75.     Silver copied Abeona on an email to Stanford in which he told Stanford he would

inform Abeona of what Stanford had told him.

76.     In an email to Stanford dated October 11, 2017 (attached hereto as Exhibit M),

Silver also acknowledged that Defendants did **not** have contractual rights in the EB-101

technology, and never did:

> Thank you for informing us about the statement Abeona included in its filings with the
> SEC from August and September 2016.  It has always been our position that the language
> contained in our grant agreements with Stanford giving the EB charities the right to be
> notified of new license offers is intended to trigger good faith discussions between the
> parties about the licensing of such technologies, although **we do not read our agreement
> to obligate Stanford to consummate any particular license** as a result of such
> negotiations.  We understand Stanford's concern that the language included in the
> Abeona filings could be read to suggest the existence of licensing rights that go beyond

what the EB Charities' agreements with Stanford expressly provide, and we will advise Abeona of this drafting issue.

*Id.* (emphasis added).

77.     In an email dated January 2, 2018 (Exhibit N hereto), EBRP's Silver asked Abeona to remove the restrictions from 41,666 of the shares Abeona had issued to EBRP. He also asked Abeona to issue another 125,000 shares to EBRP, claiming that Abeona was required to do so because it had entered into an option agreement with Stanford for the protein replacement therapy.

78.     EBRP's attorney, Christopher Gaspar, subsequently emailed Steven Rouhandeh, Chairman of the Board of Abeona, and repeated the claim that Abeona was obligated to issue the additional shares to EBRP by reason of Abeona's entering into the option agreement with Stanford.

79.     Abeona's counsel, John Concannon, by letter dated August 3, 2018 (Exhibit O hereto), responded to Gaspar, informing him that Abeona has no obligation to issue more shares to EBRP.

80.     Concannon noted first that EBRP claimed the right to receive more stock under the Amendment to the Agreement by reason of Abeona's having entered into an option agreement with Stanford for the VII(rC7) therapy, but that the Amendment does not purport to require Abeona to issue stock when it enters an option agreement.

81.     Concannon also informed Gaspar that "Abeona has recently come to learn from communications with Stanford University and with EBRP that the statements that EBRP and EBMRF made to induce Abeona to enter into the Agreement and the [Stock Issuance Agreement] were untrue." *See* Exhibit O.

82.     As Concannon explained, "[p]rior to the execution of the Agreement and the [Stock Issuance Agreement], EBRP repeatedly represented to Abeona personnel that EBRP and EMBRF had the contractual right to dictate to whom Stanford would license the EB-101 technology," and, indeed, that their right to direct the licensing of the technology "was the sole reason that Abeona entered into the Agreement and agreed to transfer to the charities many millions of dollars' worth of Abeona common stock." *See* Exhibit O.

83.     On October 22, 2018, EBRP's counsel sent Abeona a Request for Arbitration, invoking §12.2 of the Agreement, which provides "that disputes arising in whole or in part under or in connection with the Agreement between [EBRP] and [Abeona] be referred to arbitration pursuant to the Rules." The Request for Arbitration, exclusive of its exhibits, is attached hereto as Exhibit P.

84.     EBRP's Request for Arbitration admits, consistent with its previous acknowledgment to Stanford, that EBRP "did **not** hold an option and/or license to the EB-101 and EB-201 intellectual property…." *See* Exhibit P (emphasis added).

85.     The Request for Arbitration claims that EBRP was given stock "[t]o compensate [it] for the loss of its rights in the initially-agreed subsidiary…." *See* Exhibit P at 7.

86.     EBRP never had any "rights" in any subsidiary of Abeona.

87.     Abeona and EBRP never reached agreement with respect to the formation of any such subsidiary, or to providing EBRP with any rights in any Abeona subsidiary.

88.     EBRP acknowledges in the Request for Arbitration that "the fundamentals of the Agreement drifted away from a jointly funded 'EB-NEWCO' the parties at one point called Evoderm"; in other words, it admits that the parties did **not** reach any agreement to jointly fund an Abeona subsidiary. *See* Exhibit P at 7.

89.     Moreover, Abeona contemplated potentially giving to EBRP an interest in that never-formed subsidiary only because EBRP had represented that it had a contractual right to direct to whom the Stanford technology would be licensed, a contract right that EBRP has now admitted it never had.  The parties also contemplated EBRP raising $4 million in additional funding to contribute to that never-formed subsidiary, which EBRP failed to do.

90.     In short, Defendants provided no consideration at all for the Agreement or the Amendment, and the Agreement is therefore illusory and void *ab initio*.

91.     EBRP has admitted, both in the email to Stanford and in its own Request for Arbitration, that Defendants never had the contract right that the Agreement asserts Defendants had to direct the licensing of the referenced technology.

92.     That was the sole purported consideration that Defendants provided in exchange for the obligations to Defendants set forth in the Agreement, including the obligation to issue to the Defendants millions of dollars worth of Abeona stock.

## CAUSES OF ACTION

### Count One
### (Declaratory Judgment)

93.     Plaintiff repeats and realleges the paragraphs set forth above as if fully set forth herein.

94.     There exists an actual controversy between Abeona and Defendants relating to their respective rights and obligations under the Agreement that lies within this Court's jurisdiction.

95.     EBRP seeks to subject Abeona to arbitration of their dispute under the arbitration provision in §12.2 of the Agreement.

96.     The arbitration provision cannot be enforced because the Agreement was void *ab initio* for lack of consideration.

97.     Specifically, the Agreement's sole purpose was to confer on Abeona the rights to develop and benefit from the EB-101 technology, which Defendants represented they had the "contractual right to license" from Stanford.

98.     But as EBRP has subsequently admitted, Defendants did **not** have the contractual right to license or direct the EB-101 technology.

99.     Defendants gave no other sufficient consideration for the Agreement.

100.    Because there was a failure of consideration, the Agreement never came into being.

101.    Alternatively, the Agreement is illusory because it imposes no obligations on Defendants.

102.    Because the Agreement is void *ab initio*, its arbitration provision cannot be enforced.

103.    The determination of whether the Agreement was void *ab initio* must be made by the Court, not the arbitrator.

104.    Declaratory relief is appropriate because a real, substantial, and immediate controversy is presented regarding the parties' rights, duties, and liabilities.

105.    Pursuant to 28 U.S.C. §2201 et seq., and Rule 57 of the Federal Rules of Civil Procedure, Abeona asks this Court to declare that the Agreement is void as illusory and/or for lack of consideration, and that Abeona has no obligation to arbitrate the claims asserted against it by EBRP in the Arbitration.

106.    Abeona further requests an order from this Court declaring that Abeona has no obligation to issue any further stock to Defendants, and no obligation to lift the restrictions on any of the stock it already issued to Defendants.

107.    Abeona further requests an order from this Court declaring that Defendants have no right to stock that Abeona has issued to them, and requiring them to return the stock to Abeona, or it value to the extent they have sold any of the stock.

**Count Two**
**(Preliminary and Permanent Injunction)**

108.    Plaintiff repeats and realleges the paragraphs set forth above as if fully set forth herein.

109.    A party suffers irreparable harm as a matter of law when forced to spend time and resources arbitrating a claim that is not subject to arbitration.

110.    Abeona will suffer immediate and irreparable harm if it is compelled to arbitrate the claims asserted against it in the Arbitration.

111.    Abeona is likely to succeed on the merits because the Agreement is void for lack of consideration, or, alternatively, is an illusory agreement, and its arbitration provision therefore cannot be enforced.

112.    The balance of equities weighs heavily in favor of an injunction of the Arbitration.

113.    Abeona has no adequate remedy at law.

114.    Accordingly, pursuant to 28 U.S.C. §1651, Abeona seeks orders from this Court preliminarily and permanently enjoining EBRP from pursuing its claims against Abeona in the Arbitration.

## PRAYER FOR RELIEF

WHEREFORE, Abeona respectfully requests that this Court enter an order:

1.      Declaring that Abeona has no obligation to arbitrate against EBRP in the Arbitration;

2.      Declaring that the Agreement is void for lack of consideration;

3.      Declaring that the Agreement is void as illusory;

4.      Declaring that Abeona has no obligation to issue any stock to the Defendants;

5.      Declaring that Abeona has no obligation to lift the restrictions on any of the stock it issued to Defendants;

6.      Declaring that Defendants have no right to stock that Abeona has issued to them;

7.      Enjoining EBRP from pursuing any claims against Abeona in the Arbitration;

8       Ordering that Defendants must return the stock to Abeona, or, to the extent they have sold any of it, pay its value to Abeona;

9.      Awarding Abeona costs of suit; and

10.     Awarding Abeona such other and further relief as is just and proper.

Dated:  November 21, 2018

Respectfully submitted,

Jordan D. Hershman (NY 2207660)
MORGAN, LEWIS & BOCKIUS, LLP
101 Park Avenue
New York, NY 10178-0060
Tel.: 212-309-6000
Fax: 212-309-6001
jordan.hershman@morganlewis.com

Michael D. Blanchard (SDNY ID MB 0727)
MORGAN, LEWIS & BOCKIUS, LLP
One Federal Street
Boston, MA 02110
Tel.: 617-951-8061
Fax: 617-951-7701
michael.blanchard@morganlewis.com

*Attorneys for Plaintiff*