# Exhibit C

**Carrigan, James P.**

| | |
|---|---|
| ᴵ㍔m: | Carrigan, James P. |
| ͺent: | Tuesday, February 2, 2016 1:29 PM |
| To: | ken@schanerlaw.com |
| Cc: | Concannon III, John J.; Mark Ahn (mahn@abeonatherapeutics.com) |
| Subject: | revised EvoDerm-EBRP Agreement |
| Attachments: | 2-2-16 redline Abeona_EBRP Agreement.docx |

Ken:

Attached find a revised draft of the Agreement marked from your draft of 1/13.  Most of the revisions should be self-explanatory but please note the following:

1) EvoDerm is not licensing the UMinn technology.  That was (I understand) discussed and agreed by the parties as part of the term sheet (and is not in the final term sheet), the UMinn technology is separate from the Stanford technology.

2) There will be 2 separate license agreements with Stanford for the 2 different Stanford technologies.  EBRP only ᴵ㍔ded one of these technologies (EB-101) not both of them.

Jay Carrigan

Morgan, Lewis & Bockius LLP

One Federal Street | Boston, MA 02210-0060

Direct: +1.617.951.8363 | Main: +1.617.951.5000 | Fax: +1.617.951.8736

jay.carrigan@morganlewis.com <mailto:jay.carrigan@morganlewis.com> | www.morganlewis.com <http://www.morganlewis.com>

Assistant: Susan Forbes | +1.617.951.8545 | susan.forbes@morganlewis.com <mailto:@morganlewis.com>

1

2/2/13/16
## AGREEMENT

This Agreement (this *"Agreement"*) is entered into as of Febr~~January~~ __, 2016 (*"Effective Date"*) by and among Abeona Therapeutics Inc., a Delaware corporation (*"Abeona"*), its Affiliate EvoDerm Biopharma, Inc., a Delaware corporation (*"EvoDerm"*), and EB Research Partnership, Inc., a New York not-for-profit corporation that is exempt from federal taxation pursuant to Section 501(c)(3) of the Internal Revenue Code (*"EBRP"*).

### Background

Abeona is in the business of developing therapeutic drugs for the treatment of certain human health conditions.

EBRP's principal charitable mission is to support laboratory and clinical research that will lead to therapies that can treat Epidermolysis Bullosa.

Abeona and EBRP see a mutually beneficial opportunity to collaborate with respect to the development and introduction of new treatments for Epidermolysis Bullosa.

EBRP has the contractual right to license from The Board of Trustees of the Leland Stanford Junior University ("Stanford") ~~(i)~~ EB-101 (LZRSE-Col7A1 Engineered Autologous Epidermal Sheets (LEAES)) ~~and (ii) AAV-based gene therapy EB-201 (AAV DJ-COL7A1) and the contractual right to license from the University of Minnesota ("Minnesota", and together with Stanford, "Universities" and each a "University") Talen-based gene-correction technology for type VII collagen (TALEN)~~, and wishes to have Abeona, acting through newly formed EvoDerm (a special purpose company formed for the purposes hereinafter provided), to exercise such rights and enter into a license with Stanford~~each such University~~ for such technology in the form of license agreement attached to this Agreement as **Attachment 6~~7~~**, and perform preclinical development and perform clinical trials of a gene therapy treatment for Epidermolysis Bullosa based upon such in-licensed technology. Abeona, acting through EvoDerm shall also enter into a license with Stanford for the AAV-based gene therapy EB-201 (AAV DJ COL7A1) technology in the form of the license agreement attached to this Agreement as **Attachment 7**, and EvoDerm shall perform preclinical development and perform clinical trials of a gene therapy treatment for Epidermolysis Bullosa based upon such in-licensed technology.

NOW, THEREFORE, in consideration of the mutual covenants set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## 1. DEFINITIONS

**1.1 Defined Terms.** Capitalized terms used in this Agreement and not otherwise defined herein shall have the meaning set forth below.

*"Affiliate"* means with respect to any party, any Person that, directly or indirectly, is controlled by, controls or is under common control with such party. For purposes of this definition only, *"control"* means, with respect to any Person, the direct or indirect ownership of more than fifty percent (50%) of the voting or income interest in such Person or the possession otherwise, directly or indirectly, of the power to direct the management or policies of such Person.

*"Applicable Laws"* means any national, supra-national, federal, state or local laws, treaties, statutes (including the FD&C Act), ordinances, rules and regulations, including any rules, regulations, guidance or guidelines having the binding effect of law, or requirements of Regulatory Authorities, national securities exchanges or securities listing organizations, government authorities, courts, tribunals, agencies other than Regulatory Authorities, legislative bodies and commissions that are in effect from time to time during the term of the Agreement.

*"Business Day"* means any day other than a Saturday or Sunday that is not a national holiday in the United States.

*"Commercially Reasonable Efforts"* means (i) with respect to any objective by any party, commercially reasonable, diligent, good faith efforts to accomplish such objective as such party would normally use to accomplish a similar objective under similar circumstances; and (ii) with respect to any objective relating to the development or commercialization of any product by any party, efforts and resources normally used by other companies of similar size to Abeona with respect to a technology of similar market potential at a similar stage in the development or life of such product, taking into account issues of safety, efficacy, product profile, the competitiveness of the marketplace, the proprietary position of the product, the regulatory structure involved, and other relevant commercial factors.

*"Commercialization"* means any and all activities of importing, exporting, marketing, promoting, distributing, offering for sale and selling a EvoDerm Product, which may include clinical trials that are not mandated by a Regulatory Authority to support an application to obtain or maintain Regulatory Approvals for the EvoDerm Product, and pre-launch and market preparation activities (if any) after Regulatory Approval of a EvoDerm Product and prior to commencement of sales of a EvoDerm Product. When used as a verb, *"Commercialize"* means to engage in Commercialization.

*"Confidential Information"* means any proprietary or confidential information of either party (including but not limited to all EvoDerm Background Intellectual Property) disclosed to the other party pursuant to this Agreement, except any portion thereof which: (i) is known to the receiving party, as evidenced by the receiving party's prior written records, before receipt thereof under this Agreement; (ii) is disclosed to the receiving party by a third person who is under no obligation of confidentiality to the disclosing party hereunder with respect to such information and who otherwise has a right to make such disclosure; (iii) is or becomes generally known in the public domain through no fault of the receiving party; or (iv) is independently developed by the receiving party, as evidenced by the receiving party's written records, without access to such information.

*"Control" or "Controlled"* means, with respect to any Intellectual Property Right, the possession (whether by ownership, license, or other agreement or arrangement existing now or after the Effective Date, other than pursuant to this Agreement) by a party or an Affiliate thereof of the right to grant to the other party a license as provided herein under such Intellectual Property Right without violating the terms of any agreement or other arrangement of such party or its Affiliate with any third party.

*"Development"* means the development of any EvoDerm Product, including all aspects of all activities that are necessary to enable the filing of an IND for a EvoDerm Product as well as those activities occurring from and after the filing of an IND, through and including obtaining Regulatory Approval of a biologics license application or new drug application and any other Regulatory Approvals required for the Manufacture and Commercialization of such EvoDerm Product in a country. Development includes performance of clinical trials that are required by a Regulatory Authority as a condition to obtaining or maintaining Regulatory Approvals for the EvoDerm Product.

*"EvoDerm Background Intellectual Property"* means, individually and collectively, all Intellectual Property Rights that are conceived, discovered, developed, generated, created, made or reduced to practice or tangible medium of expression solely by employees or consultants or subcontractors of Abeona or EvoDerm at any time prior to the Effective Date, or after the Effective Date if such Intellectual Property Rights are not based upon or related to the performance of the activities specified in the Research and Development Plan. The term EvoDerm Background Intellectual Property, however, does not include any techniques, methodologies, know-how, information and data which is, as of the Effective Date or later becomes, generally available to the public, other than such techniques, methodologies, know-how, information and data included in EvoDerm Patent Rights.

*"EvoDerm Patent Rights"* shall mean any Patents Controlled by EvoDerm or its Affiliates claiming EvoDerm Background Intellectual Property and Program Intellectual Property owned by EvoDerm.

*"EvoDerm Product"* means, any product for the treatment of Epidermolysis Bullosa.

*"FDA"* means the United States Food and Drug Administration, or any successor thereto.

*"FD&C Act"* means the United States Federal Food, Drug and Cosmetic Act of 1938 and applicable regulations promulgated thereunder, as amended from time to time.

*"Field"* shall mean the treatment of all types of Epidermolysis Bullosa.

*"First Commercial Sale"* of a EvoDerm Product means the first transfer by EvoDerm, its Affiliates or sublicensees for value in an arms'-length transaction to an independent third party distributor, agent or end user in a country within the Territory after obtaining all Regulatory Approvals necessary for such transfer in such country. For the avoidance of doubt, sales prior to receipt of all Regulatory Approvals necessary to commence regular commercial sales, such as so-called "treatment IND sales", "named patient sales", "compassionate use sales", or use under the ATU system in France and/or the International Pharmi system in Europe shall not be construed as a First Commercial Sale.

*"IND"* means an investigational new drug application, as defined in the FD&C Act, filed with the FDA and necessary for beginning clinical trials of any product in humans or any equivalent application or other documentation filed with any Regulatory Authority of a country other than the U.S. required to begin clinical trials of any product in humans in that country.

*"Intellectual Property Right(s)"* means discoveries, inventions, know-how, trade secrets, techniques, methodologies, modifications, improvements, works of authorship, designs and data (whether or not protectable under patent, copyright, trade secrecy or similar laws).

*"Manufacturing"* means any and all activities related to the production of a EvoDerm Product Developed and/or Commercialized under this Agreement. Manufacturing shall include: (a) technical and process development activities in connection with development of the manufacturing or production process for EvoDerm Products and scale-up of such process; (b) manufacturing and production activities; (c) quality assurance activities; (d) testing activities, including stability testing and conformance testing; and (e) any and all other activities required to release manufacturing lots of EvoDerm Product. When used as a verb, *"Manufacture"* means to engage in Manufacturing.

*"Patents"* means all existing patents and patent applications and all patent applications hereafter filed, including any continuation, continuation-in-part, division, provisional or any substitute applications, any patent issued with respect to any such patent applications, any reissue, reexamination, renewal or extension (including any supplementary protection certificate) of any such patent, and any confirmation patent or registration patent or patent of addition based on any such patent, and all foreign counterparts of any of the foregoing.

*"Person"* means any individual, corporation, association, partnership (general or limited), joint venture, trust, estate, limited liability company, limited liability partnership, unincorporated organization, government (or any agency or political subdivision thereof) or other legal entity or organization, other than EvoDerm or EBRP.

*"Phase II Clinical Trial"* means any clinical study of a Licensed Product in human patients of the safety, dose range and efficacy of such Licensed Product that would satisfy the requirements of 21 C.F.R. 312.21(b).

*"Phase III Clinical Trial"* means any clinical study of any Licensed Product in human patients with the disease target being studied that would satisfy the requirements of 21 C.F.R. 312.21(c).

*"Program Intellectual Property"* means, individually and collectively, all Intellectual Property Rights that are conceived, created, discovered, developed, generated, made or reduced to practice or fixed in a tangible medium of expression as part of or based upon or related to activities undertaken as part of the Program (defined in Section 2.1) whether:  (i) solely by one or more employees or consultants or subcontractors of EvoDerm; (ii) jointly by one or more employees or consultants or subcontractors of EBRP and one or more employees or consultants or subcontractors of EvoDerm; or (iii) solely by one or more employees or consultants or subcontractors of EBRP.  The term Program Intellectual Property, however, does not include any techniques, methodologies, know-how, information and data which is, as of the Effective Date or later becomes, generally available to the public, other than such techniques, methodologies, know-how, information and data included in Program Patent Rights.

*"Program Patent Rights"* means those Patents covering Program Intellectual Property.

*"Regulatory Approvals"* means, for any country in the Territory, those authorizations by the appropriate Regulatory Authority(ies) required for the manufacture, importation, marketing, promotion, pricing, sale (and reimbursement) of a drug in such country.

*"Regulatory Authority"* means any national, supra-national, regional, state or local regulatory agency, department, bureau, commission, council or other governmental entity, with authority over the distribution, importation, exportation, manufacture, production, use, storage, transport, clinical testing or sale of a EvoDerm study drug that becomes subject to a Research and Development Plan, including the FDA.

*"Regulatory Filings"* means, for any country, those applications, filings, dossiers and the like submitted to a Regulatory Authority for the purpose of obtaining an approval from such Regulatory Authority to perform a clinical study that is subject to this Agreement in such country.

*"Stanford License Agreements"* means the license agreements entered into between EvoDerm and Stanford providing for the license of: (i) the EB-101 (LZRSE-Col7A1 Engineered Autologous Epidermal Sheets (LEAES)) in the form attached as **Attachment 6** and (ii) the AAV-based gene therapy EB-201 (AAV DJ COL7A1) technology to EvoDerm in the form attached to this Agreement as **Attachment 7**.

*"Territory"* means all the countries of the world.

**1.2 Other Defined Terms.** The following terms shall have the meanings set forth in the section appearing opposite such term:

| | |
|---|---|
| *"Abeona"* | Recitals |
| *"Agreement"* | Recitals |
| *"Arbitration Request"* | Section 12.2 |
| *"Bankruptcy Code"* | Section 9.3 |
| *"Budget"* | Section 2.1 |
| *"Cap"* | Section 5.3(a) |
| *"Change Notice"* | Section 2.6 |
| "CPR" | Section 12.2 |
| *"EBRP"* | Recitals |
| *"EBRP Indemnified Party"* | Section 11.3 |
| "EvoDerm" | Recitals |
| *"EvoDerm Program Intellectual Property"* | Section 8.1 |
| *"Effective Date"* | Recitals |
| *"Force Majeure"* | Section 13.2 |
| *"Loss(es)"* | Section 11.3 |

4

| *"Program"* | Section 2.1 |
| *"Recipient"* | Section 7.1 |
| *"Research and Development Plan"* | Section 2.1 |
| *"Rules"* | Section 12.2 |
| *"SAB"* | Section 6.1 |
| *"Successful Completion"* | Section 3.1. |

## 2. DEVELOPMENT PROGRAM

**2.1 Research and Development Plan.** (a) Abeona and EvoDerm shall prepare and provide EBRP with a draft research plan (the *"Research and Development Plan"*) that describes the (i) objectives, design, method and statistical measurements that Abeona will employ with respect to the performance of a Phase II/Phase III Clinical Trial of a EvoDerm Product for the treatment of Recessive Dystrophic Epidermolysis Bullosa, (ii) the other actions to be undertaken by EvoDerm to Develop a EvoDerm Product for the treatment of Recessive Dystrophic Epidermolysis Bullosa (collectively, the activities described in clauses (i)-(ii) are the *"Program"*), and (iii) schedule for the performance of such Program, and (iii) the budget for such program (the *"Budget"*).  The Research and Development Plan (including the Budget) will become subject to this Agreement when approved in writing by Abeona, EvoDerm and EBRP.

(b) Abeona has submitted a draft Research and Development Plan attached as **Attachment 1** and a draft Budget attached as **Attachment 2** for review by the SAB (defined in Section 6). It is expressly understood and agreed that approval of the Research and Development Plan and the Budget by each party shall be subject to such party's sole discretion and the procedures specified in Sections 2.6 and 12.1-12.2 shall not apply to matters concerning the initial Research and Development Plan and initial Budget, though the provisions of Section 2.6 shall apply to changes (if any) to the Research and Development Plan and the Budget that are later proposed by a party.  By its execution of this Agreement, each party approves the Research and Development Plan attached as **Attachment 1** and the Budget attached as **Attachment 2**.

**2.2 Performance of Research and Development Plan.** (a) Following approval of the Research and Development Plan, EvoDerm shall be solely responsible for and use its Commercially Reasonable Efforts to conduct the Program in accordance with the Research and Development Plan and all Applicable Laws.

(b) EvoDerm's obligations with respect to the performance of the Program include providing by itself or through contracted third parties: (i) the level of staffing required by the Research and Development Plan, with staff who possess the necessary experience, training and scientific expertise in order for EvoDerm to fulfill its obligations under this Agreement; and (ii) the laboratories, offices, equipment and facilities necessary to perform the Program in accordance with the Research and Development Plan; and (iii) applying for patent protection for new inventions and maintaining existing Patent rights.

(c) EvoDerm, at its sole expense, shall be responsible for and shall use its Commercially Reasonable Efforts to manufacture required amounts of study drug, control drug and/or placebo, as applicable, for the Program as specified in the Research and Development Plan.

(d) EvoDerm, at its sole expense, shall be responsible for the preparation and filing, with the appropriate Regulatory Authorities, of all documents that are necessary to conduct the Program.  EvoDerm shall notify EBRP, when such Regulatory Filings have been made.  EvoDerm shall be responsible for reporting all adverse events occurring in the Program to the appropriate Regulatory Authorities in accordance with Applicable Laws.  EvoDerm has, as of the Effective Date filed with the FDA and received the FDA's notice of no objection to the conduct of the Program.

(e) EvoDerm, at its sole expense, shall be responsible for obtaining any and all licenses from third parties necessary or desirable to perform the Program.

**2.3 Compliance with Law.** EvoDerm shall conduct the Program and its activities in connection with the Program, in a safe and prudent manner, in compliance with all Applicable Laws (including Laws, including the FD&C Act and the regulations promulgated pursuant thereto, and the International Conference on Harmonization E6 Guidelines for Good Clinical Practice), and with the standard of care customary in the biopharmaceutical industry.

**2.4 Use of Third Parties; Management.** EvoDerm shall use qualified third parties to perform portions of the Research and Development Plan and fulfill EvoDerm's obligations under this Agreement and the Research and Development Plan. EvoDerm shall remain liable for the performance of any portion of the Research and Development Plan by any third party.

**2.5 Program Reports.** (a) In addition to providing customary reporting to EBRP representatives on the EvoDerm board, EvoDerm shall provide EBRP within thirty (30) days after the end of each calendar year a financial report that includes a detailed breakdown of the actual costs of the Program. Such report shall also include a summary of the status of the progress of the Program, including difficulties encountered in achieving the objectives of the Program.

(b) EvoDerm shall provide EBRP with a copy (which may be wholly or partly in electronic format) of Regulatory Filings relating to the Program and periodic summaries of clinical data and Program results.

**2.6 Changes.** (a) Any party, may request amendments to the Research and Development Plan to reflect refinements in expectations obtained as the Program moves forward, or if assumptions set forth in the Research and Development Plan are determined to be inaccurate. If a party wishes to make an amendment to the Research and Development Plan it shall notify the other parties and the SAB of the requested change specifying the change with sufficient details to enable the other parties to evaluate it, including an assessment of the impact of the change (if any) on the total cost of the Program and the schedule for completion of the Program (a *"Change Notice"*). The SAB shall promptly review each Change Notice and make a recommendation to the parties within a reasonable period of time, not to be less than three (3) Business Days nor more than seven (7) Business Days following its review of the Change Notice.

(b) Within ten (10) Business Days following the date the parties receive a recommendation from the SAB regarding a Change Notice, each of the parties shall notify the others and the SAB whether or not it accepts the Change Notice. If each party accepts the Change Notice, then the provisions of this Agreement and the Research and Development Plan shall be deemed amended to incorporate such change in accordance with the Change Notice. If any party notifies the others and the SAB that it does not accept the recommendation of the SAB concerning such Change Notice within the Response Period, then the Change Notice shall be deemed withdrawn. A party objecting to a recommendation of the SAB shall provide a detailed statement of the basis for its objection, including a proposed revision to the Change Notice that it would accept.

(c) If the parties are unable to agree upon a Change Notice using the procedure set forth in Section 2.6(b), they shall promptly meet by conference call, videoconference or in person to determine a mutually acceptable resolution and if they are unable to resolve the matter at such meeting then the matter shall be addressed using the procedure specified in Section 12.1.

(d) Notwithstanding the provisions of Section 2.6(b)-(c), it is understood and agreed that (i) if a Change Notice that is submitted in response to a change mandated by a Regulatory Authority is not accepted by all parties then the Program shall not proceed or continue until the parties have resolved their differences in a manner that satisfies the Regulatory Authority mandate; (ii) EBRP shall not be required to fund increased costs under the Program if such costs will exceed the sum set forth in Section 3.1(a) unless EBRP consents to fund such increased costs; and (iii) if a Change Notice would require the expenditure of additional sums to complete the Program and EvoDerm is willing to bear such increased costs then EBRP shall not object to the Change Notice based upon cost considerations.

**2.7 Program Intellectual Property Rights.** EvoDerm shall require any third parties that it engages, directly or indirectly, to perform services in connection with the Program to enter into a written agreement pursuant to which such third party assigns to EvoDerm or grants EvoDerm an exclusive, worldwide, royalty-free license to use any Intellectual Property Rights that are conceived, created, discovered, developed, generated, made or reduced to practice or fixed in a tangible medium of expression by such third party's personnel as part of or based upon or related to activities undertaken as part of the Program as necessary or useful in connection with EvoDerm's efforts relating to the development and commercialization of a EvoDerm Product in the Territory.

**2.8 Completion of Program.** Unless this Agreement is sooner terminated in accordance with Section 9.2, the Program shall end when EvoDerm has received Regulatory Approval for a EvoDerm Product from the FDA.

## 3. FUNDING FOR PROGRAM

**3.1 Abeona Funding.** (a) Subject to the provisions of Sections 2.6(d) and 9.2, Abeona shall provide EvoDerm with at least $8,000,000 in funding for the Program until the Successful Completion of a Phase II/Phase III Clinical Trial of a EvoDerm Product for the treatment of Recessive Dystrophic Epidermolysis Bullosa. *"Successful Completion"* means that EvoDerm and/or a Regulatory Authority (e.g. FDA in US), as the case may be, has determined that the clinical trial does not need to be repeated and that additional clinical data is not required with respect thereto in order to initiate the next clinical trial or file a NDA or a BLA, as the case may be.

(b) EvoDerm shall monitor expenditures, in accordance with its financial policies, to ensure that the funds provided by Abeona and EBRP are spent solely for amounts in the Research and Development Plan Budget. EvoDerm shall have the right to re-budget funds between cost categories as deemed necessary by EvoDerm but subject to compliance with the provisions of Sections 2.6.

(c) EvoDerm shall provide Abeona and EBRP with reports covering use of the funding as specified in Section 2.5(a). EvoDerm shall keep and maintain adequate books and records to furnish complete, detailed and accurate information to EBRP regarding calculation of the amounts expended by EvoDerm on the Program and any Budget deviations, according to the provisions of Section 5.1(b). During the term of the Program and for three (3) years following its termination, EvoDerm shall make such records available for inspection by an independent certified public accountant, selected by EBRP and reasonably acceptable to EvoDerm, during regular business hours at such place or places where such records are customarily kept, upon reasonable notice from EBRP, to verify the accuracy of the expenses required to be paid by EBRP under the Research and Development Plan. Such inspection right shall not be exercised more than once in any calendar year. EBRP will hold in confidence all information concerning expenses and all information learned in the course of any inspection, except to the extent necessary for EBRP to reveal such information in order to enforce its rights under this Agreement in a proceeding in accordance with Section 12.2 or if disclosure is required by law, regulation or judicial order. Any person or entity conducting such inspection will agree in writing with EBRP to treat all records reviewed in the course of the inspection as the Confidential Information of EvoDerm under terms and conditions no less restrictive than the terms contained in Section 7.1. The results of each inspection shall be binding on both parties absent mathematical error. EBRP shall pay for such inspections, except that in the event there is any downward adjustment in aggregate amounts payable for any year shown by such inspection of more than three percent (3%) of the amount paid in addition to refunding to EBRP the amount of any such adjustment, EvoDerm shall pay for such inspection.

**3.2 Payment.** Abeona shall make payment of the amounts due under Section 3.1 in accordance with the Research and Development Plan Budget attached as **Attachment 2**. Payment shall be made to EvoDerm or, at the direction of EvoDerm, to other persons or entities incurring direct costs of the Program in accordance with separate agreements between EvoDerm and such other persons.

7

**3.3 Purchase and Sale of Stock.** (a) Within ten (10) days after the Effective Date, EBRP shall make an equity investment of four million dollars ($4,000,000) purchasing shares of Abeona Common Stock, $0.001 par value per share, at a price per share equal to the 5-day NASDAQ Volume Weighted Average Price on the Effective Date, pursuant to that certain Stock Purchase Agreement substantially in the form attached as **Attachment 3** hereto. The purchased shares will be unrestricted registered shares.

(b) The cash proceeds received by ABEO from EBRP will be used by ABEO to fund the operations of EvoDerm and solely for the research and development plan in accordance with the Budget. Any amounts not used in accordance with the preceding sentence shall be repaid by EvoDerm to EBRP and Abeona hereby guarantees such repayment. For the avoidance of doubt, it is understood and agreed that the $8,000,000 obligation of Abeona under Section 3.1(a) includes $4,000,000 received from EBRP.

**3.4 Conditions to Funding.** The obligation of Abeona to fund EvoDerm pursuant to Section 3.1 and the obligation of EBRP to purchase $4,000,000 worth of Abeona Common Stock is subject to the fulfillment of each of the conditions set forth in Sections 4.1-4.56.

## 4. OBLIGATIONS OF EVODERM; OBLIGATIONS OF ABEONA.

**4.1 EvoDerm.** EvoDerm has been formed as a Delaware corporation that is a subsidiary of Abeona with a single class of Common Stock and no Preferred Stock. EvoDerm's sole corporate purpose shall be the development and commercialization of products for the treatment of Epidermolysis Bullosa, EvoDerm's initial focus shall be on the development and commercialization of products for the treatment of Recessive Dystrophic Epidermolysis Bullosa.

**4.2 License Agreements.** EvoDerm shall have entered into the Stanford License Agreements with the Universities attached hereto as Attachment 7. It is understood and agreed that the Stanford License Agreements shall include a provision under which Stanfordeach University permits EBRP to obtain the assignment of such license agreement from EvoDerm immediately prior to the time when Stanfordeach such University terminates such license agreement based upon a breach by EvoDerm of the terms of such license agreement, including without limitation EvoDerm's failure to meet the diligence obligations set forth in such license agreement. It is further understood and agreed that EvoDerm shall, as part of the Stanford License Agreements assume responsibility for all patent costs in respect of the technology licensed from Stanfordeach University and that EBRP shall no longer be responsible for payment of such patent expenses to Stanfordeach such University.

**4.3 Abeona Stock Purchase Agreement.** Abeona and EBRP shall have entered into a Stock Purchase Agreement in accordance with Section 3.3.

**4.4 EvoDerm Stock Issuance Agreement.** EvoDerm and EBRP shall have entered into a Stock Issuance Agreement pursuant to which EvoDerm shall issue to EBRP shares of EvoDerm representing a 33.33% ownership position in EvoDerm, calculated on a fully diluted basis. The form of Stock Issuance Agreement is attached as **Attachment 4**.

**4.5 EvoDerm Voting Agreement.** EvoDerm, Abeona and EBRP shall enter into a Voting Agreement that provides that the authorized size of the Board of Directors of EvoDerm shall be sixthree, and that four of the initial members of the Board of Directors shall be designated by Abeona and two of the initial members shall be designated by EBRP,, and Alex Silver. Such voting agreement shall also provide that EBRP, as the holder of 33.33% of the capital stock of EvoDerm shall have the right to designate one director and Abeona as the holder of 66.67% of the capital stock of EvoDerm shall have the right to designate two directors. If the size of the EvoDerm Board of Directors is increased, then the holders of the capital stock of EvoDerm shall each vote to fill such additional board seats in a manner that results in EBRP designees holding 1/3 of such seats and Abeona designees holding 2/3 of such seats, unless the

parties otherwise agree (e.g., with respect to independent directors). The form of Voting Agreement is attached as **Attachment 5**.

4.6. ~~Put and Call Agreement. EvoDerm, Abeona and EBRP shall have entered into a Put and Call Agreement that provides for instances in which EBRP may put its EvoDerm shares to Abeona and Abeona may call the EvoDerm shares, and the method for determining purchase price. The form of Put and Call Agreement is attached as Attachment 6.~~

**4.6̶7 Abeona Incubation Services to EvoDerm.** (a) Abeona will appoint a focused, intact management team to provide services to EvoDerm. The members of such team shall initially include a General Manager, as well as personnel with experience in clinical operations matters, regulatory matters, and Chemistry, Manufacturing and Controls (CMC) matters. Abeona will provide additional personnel as required as EvoDerm moves forwards with respect to Development and Manufacturing and commercialization matters. The cost for such personnel shall be included in the Research and Development Plan Budget.

(b) Abeona shall also provide assistance to EvoDerm as necessary to cause EvoDerm to exercise Commercially Reasonable Efforts to perform the Program, as it may be modified by the terms of the License Agreements and to either bring the EvoDerm Products to Commercialization or to consummate a transaction with a third party that has the financial and scientific capacity to bring the EvoDerm Products to Commercialization.


**5. COMMERCIALIZATION OF EVODERM PRODUCTS; RECOVERY OF FUNDING**
**5.1 Development and Commercialization.** (a) Following the Successful Completion of the Phase II/Phase III Clinical Trial of an EvoDerm Product for the treatment of Recessive Dystrophic Epidermolysis Bullosa, Abeona, at its sole expense, shall be responsible for the development and commercialization of a EvoDerm Product in the Territory and shall use its Commercially Reasonable Efforts to commercialize a EvoDerm Product. Abeona shall be solely responsible for determining in which countries in the Territory to develop and commercialize each EvoDerm Product, provided that it shall use Commercially Reasonable Efforts to obtain Regulatory Approval and to market and sell each EvoDerm Product in the United States.

(b) Subject to Abeona's diligence obligations under Section 5.1(a), the parties acknowledge and agree that all business decisions regarding development and commercialization of any EvoDerm Products including, without limitation, decisions relating to the design, development, manufacture, sale, price, distribution, marketing and promotion of EvoDerm Products, including decision of whether to develop and commercialize a particular EvoDerm Product, shall be within the sole discretion of EvoDerm. The parties acknowledge and agree that so long as EvoDerm is using Commercially Reasonable Efforts to develop and commercialize at least one EvoDerm Product in the Territory, EvoDerm shall be deemed to be in compliance with its diligence obligations under this Agreement. It is understood and agreed that EvoDerm shall be subject to additional commercial diligence obligations pursuant to the terms of the License Agreements.

(c) With respect to each EvoDerm Product developed and commercialized by EvoDerm, EvoDerm shall be solely responsible, at its sole expense, for all aspects of the development and commercialization of the EvoDerm Product in the Territory, including, without limitation: (i) the manufacture of EvoDerm Products in accordance with the applicable Regulatory Approvals and Applicable Laws; (ii) preparation, filing, obtaining, maintaining and supporting, in its own name or that of its designee, with the appropriate Regulatory Authorities all regulatory approvals, authorizations, permits and licenses (including, without limitation, all Regulatory Approvals) that are necessary to conduct clinical studies of EvoDerm Products and/or to manufacture, import, distribute, market and sell EvoDerm Products; (iii) the reporting all adverse events associated with any EvoDerm Product to the appropriate Regulatory Authorities in

accordance with Applicable Laws, in the Territory; and (iv) the distribution, marketing, promotion and sale of EvoDerm Products.

**5.2 Diligence Exceptions.** All of EvoDerm's diligence obligations with respect to each EvoDerm Product being developed or commercialized by EvoDerm are expressly conditioned upon the continuing absence of any adverse condition or event which warrants a delay in commercialization of the EvoDerm Product due to an adverse condition or event relating to the safety or efficacy of such EvoDerm Product labeling or lack of regulatory approval (including pricing and reimbursement category approval (where relevant)), and EvoDerm shall have no obligation to develop or market any such EvoDerm Product so long as in EvoDerm's reasonable opinion any such adverse condition or event exists.

**5.3 Exit Transaction** (a) If EvoDerm receives an offer to acquire a controlling interest in the company, to acquire all or or or substantially all its assets, or proposes to sell, or grant a license for, any of the Program Intellectual Property Rights (collectively an ***"EvoDerm Level Exit Transaction"***), it shall promptly notify EBRP and call a board meeting to discuss the proposed transaction and seek the approval of the EvoDerm Bboard of Directors. At least 10 days prior to such meeting, EvoDerm shall furnish to the members of the board of directors a copy of all relevant documents, its due diligence investigation on the prospective buyer, and any other relevant information relating to the proposed EvoDerm Level Exit Transaction. Approval of a EvoDerm Level Exit Transaction shall require the unanimous approval of the EvoDerm board of directors, such approval by the EBRP representative on the EvoDerm board not to be unreasonable withheld.

# 6. OVERSIGHT OF PROGRAM

**6.1 SAB.** (a) Within thirty (30) days after the Effective Date, a SAB (*"SAB"*) shall be established with the responsibilities and authority set forth in this Section 6.1. The SAB shall consist of four (4) members, two (2) members to be appointed by each of Abeona and EBRP, acting jointly. Each party may, with notice to the other, substitute any of its members serving on the SAB. The parties may also, by mutual agreement, increase or decrease the number of members serving on the SAB; provided that the number of members representing each party remains equal. Abeona shall have the right to appoint one of its members to be the chairperson of the SAB.

(b) The general purpose of the SAB is to oversee the management and performance of the Program. The SAB shall have the responsibility and authority to: (i) monitor Abeona's implementation of its responsibilities under the Research and Development Plan; (ii) consider, review and approve any proposed amendments to the Research and Development Plan; (iii) report regularly to the management of each party upon the progress of the Program; (iv) provide a forum for exchange of information related to the efforts of Abeona with respect to the Program; and (v) conduct any other functions as Abeona and EBRP may agree in writing.

(c) The SAB shall hold meetings as mutually agreed by the parties (but in no event less than quarterly, unless mutually agreed by the parties). The first meeting of the SAB shall be held within sixty (60) days of the Effective Date and shall be held in New York, New York. After the initial meeting, meetings may be held by telephone or video conference. Minutes of all meetings setting forth decisions of the SAB shall be prepared by the chairperson and circulated to all parties within thirty (30) days after each meeting, and shall not become official until approved by all parties in writing; minutes shall be presented for approval as the first order of business at the subsequent SAB meeting, or if it is necessary to approve the minutes prior to such subsequent meeting, then the parties shall approve the minutes within thirty (30) days of receipt thereof.

(d) The quorum for SAB meetings shall be two (2) members, provided there is at least one (1) member from each of Abeona and EBRP present. The SAB will render decisions by unanimous vote. The members of the SAB shall act in good faith to cooperate with one another and to reach agreement with respect to issues to be decided by the SAB.

(e) Disagreements among the SAB will be resolved via good-faith discussions; provided, that in the event of a disagreement that cannot be resolved within thirty (30) days after the date on which the disagreement arose, the matter shall be referred to Abeona's Executive Chairperson and EBRP's Chief Executive Officer or their respective designees. Thereafter, if any such disagreement is not resolved within forty five (45) days, then Abeona will have the right to make the final decision and such decision shall be final and binding and shall not be subject to Section 12.2 of this Agreement; provided that it is understood and agreed that Abeona's right to exercise such final decision shall not include disputes with respect to (i) the interpretation, breach, termination or invalidity of this Agreement in which case the dispute shall be resolved in accordance with Section 12.2(a), or (ii) a "material amendment" to the Research and Development Plan for the Program, in which case the dispute shall be resolved in accordance with Section 12.2(b). A "material amendment" means an amendment to the Research and Development Plan that is not required by a Regulatory Authority and materially increases the costs to perform the Program or the time to perform the Program; provided further, that in the event and to the extent that an amendment materially increases the costs to perform the Program but Abeona has confirmed in writing that it will pay such increased costs then such amendment shall not be considered a material amendment for purposes of this Section 6.1(e) as long as such amendment does not change the basic scientific purpose of the Program.

**6.2 Operating Principles.** (a) The parties acknowledge and agree that the deliberations and decision-making of the SAB should be made in a prompt manner, consistent with sound and ethical business and scientific practices.

(b) The SAB will have only such powers as are specifically delegated to it in this Agreement, and will have no power to amend this Agreement or waive a party's rights or obligations under this Agreement.

(c) Information that otherwise falls under the definition of Confidential Information contained in reports made pursuant to Section 2.5 or otherwise communicated between the parties will be subject to the confidentiality provisions of this Agreement.

(d) Each party shall be responsible for its travel and lodging expenses in connection with attendance at SAB meetings.

## 7. CONFIDENTIALITY

**7.1 Confidentiality.** (a) During the term of this Agreement and for five (5) years thereafter, each party (i) shall maintain in confidence all Confidential Information of the other party; (ii) shall not use such Confidential Information for any purpose except as permitted by this Agreement; and (iii) shall not disclose such Confidential Information to anyone other than those of its Affiliates, sublicensees, prospective sublicensees, employees, consultants, agents or subcontractors who are bound by written obligations of nondisclosure and non-use no less stringent than those set forth in this Section 7.1 and to whom such disclosure is necessary in connection with such party's activities as contemplated in this Agreement. Each party shall ensure that such party's Affiliates, sublicensees, prospective sublicensees, employees, consultants, agents and subcontractors comply with these obligations. Each party shall notify the other party promptly on discovery of any unauthorized use or disclosure of the other's trade secrets or proprietary information.

(b) Notwithstanding the provisions of Section 7.1(a), a party receiving Confidential Information (the *"Recipient"*) may disclose Confidential Information to the extent such disclosure is (i) made in response to a valid order or subpoena of a court of competent jurisdiction or other governmental body of a country or any political subdivision thereof of competent jurisdiction; provided, that Recipient provides the other party with prior written notice of such disclosure (if practicable) in order to permit the other party to seek a protective order or other confidential treatment of such Confidential Information; and provided further that any Confidential Information so disclosed will be limited to that information that is legally required

11

to be disclosed in such response to such court or governmental order or subpoena; (ii) otherwise required by Applicable Laws; provided, that Recipient provides the other party with prior written notice of such disclosure (if practicable) in order to permit the other party to seek a protective order or confidential treatment of such Confidential Information; and provided further that any Confidential Information so disclosed will be limited to that information that is legally required by Applicable Law to be disclosed; (iii) made by the Recipient to a Regulatory Authority, as required to conduct Development or obtain or maintain Regulatory Approvals; provided that reasonable efforts shall be used to ensure confidential treatment of such Confidential Information; (iv) made by the Recipient to a third party as may be necessary or useful in connection with the Development, Manufacturing or Commercialization related to the EvoDerm Product; provided the third party is bound by written confidentiality obligations no less protective that those set forth in this Agreement; (v) made by Recipient to a U.S. or foreign tax authority to the extent legally required by Applicable Laws to be disclosed; (vi) made by Recipient to its representatives or to third parties in connection with sublicensing or financing activities of the Recipient; provided that the third party is bound by written confidentiality obligations no less protective that those set forth in this Agreement; (vii) made by Recipient or any of its representatives in the filing or publication of Patents relating to the EvoDerm Product to the extent such disclosure in the filing or publication of Patents is reasonably necessary for support of the Patents; (viii) made by Recipient to comply with Applicable Laws related to securities laws disclosure requirements or any disclosure requirements of any applicable stock market or securities exchange; or (ix) made by Recipient in compliance with Section 7.3.

**7.2 Publications.** Each party recognizes that the publication of papers regarding results of the Program, including oral presentations and abstracts, may be beneficial to both parties provided such publications are subject to reasonable controls to protect Confidential Information. In particular, it is the intent of the parties to maintain the confidentiality of any Confidential Information regarding the compounds included in any patent application until such patent application has been published. Accordingly, each party shall have the right to review and comment upon any paper proposed for publication by the other party regarding results of the Program hereunder, including oral presentations and abstracts, which utilizes data generated from the Program and/or includes Confidential Information of the other party. Before any such paper is submitted for publication, the party proposing publication shall deliver a complete copy to the other party at least thirty (30) days prior to submitting the paper to a publisher. The receiving party shall review any such paper and give its comments to the publishing party within twenty (20) days of the delivery of such paper to the receiving party. With respect to oral presentation materials, the parties shall make reasonable efforts to expedite review of such materials, and shall return such items as soon as practicable to the disclosing party with appropriate comments, if any, but in no event later than twenty (20) days from the date of delivery to the receiving party. The disclosing party shall comply with the other party's request to delete references to such other party's Confidential Information in any such paper and agrees to withhold publication of same for an additional ninety (90) days (or longer if necessary) in order to permit the parties to obtain patent protection, if either of the parties deem it necessary, in accordance with the terms of this Agreement. If there is a dispute regarding publications, such dispute shall be resolved by the SAB.

**7.3 Publicity.** No public announcement or disclosure may be made by any party with respect to the subject matter of this Agreement without the prior written consent of the other party; provided, that the provisions of this Section 7.3 will not prohibit (a) any disclosure required by any applicable legal requirement, including any legal requirement or listing standard of any exchange or quotation system on which the disclosing parties securities are listed or traded or to be listed or traded (including filing this Agreement publicly on the Securities Exchange Commission's EDGAR System), provided that the disclosing party seeks customary, reasonable and lawful actions to obtain confidential treatment for appropriate portion(s) of such disclosures under Rule 24b-2 of the Securities Exchange Act of 1934, as amended; (b) any disclosure made in connection with the enforcement of any right or remedy relating to this Agreement; (c) any disclosure made by a party to its respective employees, collaborators, licensors, licensees, contract research organizations, business partners, investors, potential investors, lenders and potential lenders provided the person receiving the disclosure has undertaken a confidentiality obligation

to the disclosing party, substantially similar to the confidentiality obligations the parties have undertaken to each other under this Agreement; or (d) any disclosure made pursuant to a press release in a form mutually agreed to by the parties (or any other subsequent disclosure containing substantially similar information).

**7.4 Use of Name.** Neither party shall use the name of any other party or of any trustee, director, officer, staff member, employee, or agent of the other party or any adaptation thereof in any advertising, promotional or sales literature or publicity or in any document employed to obtain funds or financing without the prior written approval of the party or individual whose name is to be used. Notwithstanding anything express or implied in this Section 7.4 to the contrary, the provisions of this Section 7.4 shall not preclude: (a) disclosure by Abeona of the name of EBRP in accordance with the provisions of Section 7.3 as part of a disclosure permitted under Section 7.3(a)-(d); or (b) disclosure by EBRP of the name of Abeona or Abeona's logo in any description by EBRP of its research portfolio and of its industry discovery and development program, or in connection with EBRP's fundraising activities, marketing materials and/or reporting requirements.

## 8. PROPRIETARY RIGHTS

**8.1 Title; Reservation of Rights.** (a) This Agreement does not convey to EBRP any rights in any portion of the EvoDerm Product, the EvoDerm Background Intellectual Property or the EvoDerm Program Intellectual Property by implication, estoppel or otherwise, but constitutes only a license to EBRP to use the EvoDerm Product, the EvoDerm Background Intellectual Property and the EvoDerm Program Intellectual Property as necessary to give effect to the license which may be granted under Section 9.3(d) and in accordance with all of the terms of this Agreement. Title to the EvoDerm Product, the EvoDerm Background Intellectual Property and the EvoDerm Program Intellectual Property shall at all times remain vested in EvoDerm. All rights in and to the the EvoDerm Background Intellectual Property, the EvoDerm Product and the EvoDerm Program Intellectual Property not expressly granted under this Agreement are reserved to and retained by EvoDerm.

(b) Title to and any interest in Program Intellectual Property shall, regardless of inventorship, become the sole property of EvoDerm (*"EvoDerm Program Intellectual Property"*).

**8.2 Disclosure; Prosecution.** (a) EvoDerm shall promptly disclose to EBRP and Abeona in writing any EvoDerm Program Intellectual Property that might, under applicable law, be patentable or otherwise protectable.

(b) EvoDerm shall have the sole right, but not the obligation, to file, prosecute, and maintain, at EvoDerm's sole expense, patents covering EvoDerm Program Intellectual Property. EvoDerm shall promptly furnish or have furnished to Abeona and EBRP copies of all patents, patent applications, substantive patent office actions, and substantive responses received or filed in connection with such applications. Abeona and EBRP may each through its attorney offer comments and suggestions with respect to the matters that are the subject of this Section 8.2(b) and EvoDerm agrees to consider such comments and suggestions; provided that nothing herein shall obligate EvoDerm to adopt or follow such comments or suggestions.

(c) If EvoDerm proceeds to pursue patent prosecution activities in respect of EvoDerm Program Intellectual Property and thereafter elects not to prosecute or maintain a patent or patent application in respect of such EvoDerm Program Intellectual Property, it shall notify Abeona and EBRP of such decision at least forty-five (45) days prior to the due date of any action or payment due. Abeona and/or EBRP shall then have the right, but not the obligation, to assume the responsibility therefor at its sole expense.

(d) Each party shall sign all necessary documents or take such other actions as may reasonably be requested in order to perfect any and all rights of EvoDerm in EvoDerm Program Intellectual Property.

13

## 9.  TERM; TERMINATION

**9.1 Term.**  This Agreement shall take effect as of the Effective Date and shall remain in effect until its expiration upon the expiration or termination of the Stanford License Agreement, unless sooner terminated in accordance with Section 9.2.

**9.2 Termination.**  (a)  The parties may terminate this Agreement at any time by mutual agreement.

(b)  Without limitation to other damages to which a party may be entitled as a result of a breach of this Agreement, Abeona or EBRP may terminate this Agreement upon forty-five (45) days written notice to the other party if the other party commits a material breach of this Agreement, unless such breach is cured within the forty-five (45) day notice period, or if such breach is not capable of being cured within forty-five (45) days unless such party during such forty-five (45) day period initiates actions reasonably expected to cure the breach and thereafter diligently proceeds to cure the breach.

(c)  Abeona or EBRP, each in the capacity of a disadvantaged party (as defined in Section 13.2) shall have the right to terminate this Agreement upon thirty (30) days' notice if a Force Majeure condition has prevented performance by the other party for more than sixty (60) consecutive days or an aggregate one hundred twenty (120) days in any 12-month period; provided that this Section 9.2(c) shall not apply in the event and to the extent it conflicts with the provisions of Section 9.3(d), the intention of the parties being that in the event of a conflict Section 9.3(d) should control.

(d)  Abeona shall have the right to terminate this Agreement with written notice to the other parties if authorization and approval to perform the Program is withdrawn by the FDA or other Regulatory Authorities or human or toxicological test results support termination of the Program for reasons of safety or if the emergence of any adverse event or side effect in the Program is of such magnitude or incidence in the opinion of Abeona as to support termination.

(e)  Abeona or EBRP shall have the right to terminate this Agreement if the other party commences a voluntary case under the Bankruptcy Code or acquiesces to any petition filed against it in an involuntary case under the Bankruptcy Code, or if such party contests such action, such case is not dismissed within sixty (60) days of its initial filing.

**9.3 Consequences of Termination.**  (a)  Upon termination (including expiration) of this Agreement for any reason:  (i) EvoDerm and Abeona will terminate all tasks (if any) for the Program in an orderly manner, as soon as practical and in accordance with a schedule agreed to by the parties; (ii) EvoDerm shall deliver to EBRP copies of all materials developed through the termination of the Program; and (iii) Abeona and EvoDerm shall pay to EBRP any monies received by EBRP and not spent on development of the EvoDerm Product at the time of termination, including those funds (if any) required to be expended to wind-down the development program.

(b)  Subject to Section 9.2, upon any termination (including expiration) of this Agreement each party shall return to the other party or certify in writing to the other party that it has destroyed all documents (including those stored on computer systems and networks) and other tangible items it or its employees or agents have received or created pertaining, referring or relating to the Confidential Information of the other party; provided, that a party is permitted to retain one copy of such materials in its legal files to be used to verify compliance with its obligations hereunder.

(c)  Nothing herein shall be construed to release either party of any obligation which matured prior to the effective date of any termination.

(d)  If this Agreement is terminated by EBRP based upon EvoDerm's breach of its diligence obligations under this Agreement for a period of one hundred eighty (180) consecutive days and such cessation of

14

activity is not based upon the factors specified in Section 5.2, or ~~termination of~~ termination ~~pursuant to~~ the Stanford License Agreement, then effective upon such termination Abeona hereby grants and agrees to grant to EBRP an exclusive, royalty-bearing ~~sublicensable~~ license, including the right to sublicense ~~in the Territory~~, under the EvoDerm Background Intellectual Property and the EvoDerm Program Intellectual Property to make, have made, use, offer to sell, sell and import the EvoDerm Product. The license granted under this Section 9.3 shall take effect upon the occurrence of the events specified in this Section 9.3(d). If the parties dispute whether the events specified in this Section 9.3(d) have occurred, they shall resolve such dispute in accordance with Section 12. The parties shall negotiate a commercially reasonable royalty rate using the procedure set forth in Sections 12.1-12.2, provided that if the parties resort to Section 12.2 the arbitrator selected by the parties of the CPR shall have experience in the valuation of biotechnology assets. It is understood and agreed that with respect to this Section 9.3(d), the definitions of EvoDerm Background Intellectual Property and EvoDerm Program Intellectual Property the term "Affiliate" shall exclude any third party that becomes an Affiliate of EvoDerm after the Effective Date as a result of a transaction in which (i) such third party directly or indirectly acquires all or substantially all of the stock or assets of EvoDerm or (ii) EvoDerm is consolidated or merged into such third party or any of its affiliates; if the result of a transaction described in clause (i) or (ii) is that any "person" or "group" (within the meaning of Section 13(d) or 14(d) of the Securities Exchange Act of 1934, as amended) acquires, directly or indirectly, the beneficial ownership, of a majority of the voting power of EvoDerm and specifically excluding any person or group that is controlled directly or indirectly by EvoDerm or its present officers or directors.

(e) If the license set forth in this Section 9.3 takes effect, Abeona shall provide EBRP within thirty (30) Business Days following the occurrence of the events specified in Section 9.3(a) or (d) or within thirty (30) Business Days following resolution of any dispute concerning whether such events have occurred, if such matter becomes the subject of the procedures specified in Section 12, Abeona shall provide EBRP with access to all clinical, safety and other data arising from the Program ~~and all other data and materials necessary to complete the development of, manufacture, and commercialize the EvoDerm Product~~. The use of all such ~~materials and~~ data shall be limited to use solely in connection with the license granted under Section 9.3(a) and for no other purpose. The parties shall also confer regarding the steps necessary to coordinate the wind down of activities under the IND for which Abeona is the sponsor and the assumption of "sponsor" activities by EBRP so that such activities are undertaken in accordance with Applicable Laws.

(f) The licenses granted under this Section 9.3 shall be treated as licenses of rights to "intellectual property" (as defined in Section 101(56) of Title 11 of the United States Code, as amended (the **"Bankruptcy Code"**)) for purposes of Section 365(n) of the Bankruptcy Code. The licensee may elect to retain and may fully exercise all of its rights and elections under the Bankruptcy Code provided, that it abides by the terms of this Agreement.

(g) Sections 1, 2.7(a), 3.1(c), 5.5, 5.6, 7, 8, 9.3, 10, 11, 12, 13.1 and 13.4-13.15 shall survive any termination or expiration of this Agreement.

## 10. REPRESENTATIONS AND WARRANTIES; COVENANTS

**10.1 Authorization, etc.** Each party hereby represents and warrants to the others that: (a) it has all requisite power and authority to execute, deliver and perform this Agreement and to consummate the transactions contemplated hereby; (b) this Agreement has been duly authorized, executed and delivered by such party, constitutes the legal, valid and binding obligation of such party and is enforceable against such party in accordance with its terms; (c) it is under no contractual or other obligation or restriction that is inconsistent with its execution or performance of this Agreement.

**10.2 Legal Compliance.** Abeona and EvoDerm each hereby represents and warrants to EBRP that it will perform its obligations under this Agreement and the Research and Development Plan in a professional

manner, and will comply, in all material respects, with all Applicable Laws, including but not limited to those administered by FDA.

**10.3 Personnel; Services.** Abeona hereby represents and warrants to EBRP that each of the persons it assigns to perform services in connection with the Program, whether such personnel are employed by Abeona or by subcontractors, shall have the proper skill, training and experience so as to be reasonably able to perform in a competent and professional manner and that all work will be so performed.

**10.4 Warranty Disclaimer.** SECTIONS 10.1-10.3 SET FORTH THE ONLY WARRANTIES PROVIDED BY ANY PARTY CONCERNING THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY. THESE WARRANTIES, TOGETHER WITH THE INDEMNIFICATION UNDERTAKINGS OF SECTION 11.3, ARE MADE EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY, NON-INFRINGEMENT, TITLE OR OTHERWISE.

## 11. REMEDIES; RISK ALLOCATION

**11.1 Equitable Remedies.** The parties acknowledge and agree that, in the event of a breach or a threatened breach of Sections 7 and 8 of this Agreement, a party may suffer irreparable damage (in addition to financial harm) for which it will have no adequate remedy at law and, accordingly, a party shall be entitled to injunctive and other equitable remedies to prevent or restrain, temporarily or permanently, such breach or threatened breach, without the necessity of posting any bond or surety. Such remedies shall be in addition to any other remedy that such party may have at law or in equity.

**11.2 Limitation of Liability.** EXCEPT FOR DAMAGES ARISING UNDER SECTION 5 AND EXCEPT AS OTHERWISE PROVIDED IN SECTION 11.3 WITH RESPECT TO THIRD PARTY CLAIMS, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY LOST PROFITS OR SAVINGS OR FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, HOWEVER CAUSED, UNDER ANY THEORY OF LIABILITY, REGARDLESS OF WHETHER THE PARTIES HAVE ADVISED OR BEEN ADVISED OF THE POSSIBILITY OF ANY SUCH LOSS OR DAMAGE.

**11.3 Risk Allocation.** (a) Subject to the provisions of Section 11.3(b), Abeona will defend, indemnify, and hold harmless EBRP and its, directors, officers, employees, agents, and their successors and assigns (each, in such capacity, a *"EBRP Indemnified Party"*) from and against any claim, suit, demand, loss, damage, expense (including reasonable attorneys' fees of EBRP Indemnified Party(ies) and those that may be asserted by a third party) or liability (collectively, *"Losses"*) arising from any claim or proceeding against the EBRP Indemnified Party(ies) by a third party to the extent that such claim or proceeding is based on: (i) any breach of Abeona's representations and warranties under this Agreement; or (ii) any negligence or intentional misconduct by Abeona (or its employees, agents or representatives) in performing its obligations under this Agreement or any Research and Development Plan or; (iii) any claim of infringement of patent rights with respect to the EvoDerm Products; or (iv) product liability or personal injury (including, but not limited to, actions in the form of tort, warranty, or strict liability) arising from or relating to the development, testing, manufacture, commercialization, use or other disposition of any EvoDerm Products by Abeona, its Affiliates, licensees and sublicensees, distributors or agents pursuant to any license or rights granted under this Agreement. The foregoing indemnification action shall not apply in the event and to the extent that such Losses arose as a result of any EBRP Indemnified Party's negligence, intentional misconduct or breach of this Agreement.

(b) To receive the benefit of indemnification under Section 11.3(a), the EBRP Indemnified Party must: (i) promptly notify Abeona of any claim or proceeding; provided, that failure to give such notice shall not relieve Abeona of its indemnification obligations except where, and solely to the extent that, such failure

actually and materially prejudices the rights of Abeona; (ii) provide reasonable cooperation to Abeona (and its insurer), as reasonably requested, at Abeona's cost and expense; and (iii) tender to Abeona (and its insurer) full authority to defend or settle the claim or suit using counsel reasonably satisfactory to the EBRP Indemnified Party; provided that no settlement requiring any admission by the EBRP Indemnified Party or that imposes any obligation on the EBRP Indemnified Party shall be made without the EBRP Indemnified Party's consent. Abeona has no obligation to indemnify a EBRP Indemnified Party in connection with any settlement made without Abeona's written consent. The EBRP Indemnified Party has the right to participate at its own expense in the claim or suit and in selecting counsel therefore using counsel reasonably acceptable to Abeona[; provided, that if (1) there is a conflict of interest that would prevent Abeona, on the one hand, and the EBRP Indemnified Party on the other hand, from being represented by a single law firm in the defense of such claim or suit, or (2) there shall be one or more additional defenses available to EBRP Indemnified Party(ies) that are not available to Abeona, then in each such instance Abeona shall pay the reasonable fees and expenses of one law firm serving as counsel for the EBRP Indemnified Party(ies), as applicable, which law firm shall be subject to the prior consent of Abeona, which consent shall not be unreasonably withheld, conditioned or delayed].

## 12. DISPUTE RESOLUTION

**12.1 Escalation.** The parties will attempt to settle any claim or controversy arising out of this Agreement or the subject matter hereof through consultation and negotiation in good faith in a spirit of mutual cooperation. Such matters will be initially addressed by the _____ of EBRP and the _____ of Abeona, as applicable, who shall use reasonable efforts to attempt to resolve the dispute through good faith negotiations by telephone or in person as may be agreed. If they fail to resolve the dispute within thirty (30) days after a party notifies the other party of the dispute, then the matter will be escalated to the _____ of EBRP and the _____ of Abeona, or their designees for resolution. They will use reasonable efforts to attempt to resolve the dispute through good faith negotiations by telephone or in person as may be agreed. If they fail to resolve the dispute within thirty (30) days after it is referred to them and do not mutually agree to extend the time for negotiation, then the dispute will be submitted to arbitration in accordance with the procedure set forth in Section 12.2.

**12.2 Arbitration.** (a) Except with respect to actions covered by Section 12.2(b), any claim or controversy arising in whole or in part under or in connection with this Agreement or the subject matter hereof that is not resolved pursuant to Section 12.1 will be referred to and finally resolved by arbitration in accordance with the International Institute for Conflict Prevention and Resolution Rules for Non-Administered Arbitration (the *"Rules"*) of the Center for Public Resources (*"CPR"*), as such Rules may be modified by this Section 12.2. If a party intends to begin an arbitration to resolve a dispute arising under this Agreement after the provisions of Section 12.1 have been exhausted, such party shall provide written notice (the *"Arbitration Request"*) to the other party of such intention and the issues for resolution. From the date of the Arbitration Request and until such time as the dispute has become finally settled, the running of the time periods as to which a party must cure a breach of this Agreement becomes suspended as to the subject matter of the dispute. Unless the parties otherwise agree in writing, during the period of time that any arbitration proceeding is pending under this Agreement, the parties shall continue to comply with all those terms and provisions of this Agreement that are not the subject of the pending arbitration proceeding. The arbitration shall be conducted by one arbitrator, who will be agreed upon by the parties to such claim or controversy. If the applicable parties are unable to agree upon a single arbitrator within thirty (30) days following the date arbitration is demanded, then the arbitrator shall be selected from a list of at least five nominee's selected by the CPR within ten (10) Business Days after the date the parties notify the CPR of their inability to agree upon an arbitrator. The parties shall have twenty (20) Business Days after the receipt of such nominations to agree on an arbitrator who shall not be an employee, director or equity holder of any applicable party or, failing to agree, to rank-order their preferences with the most preferred being given the lowest number, and deliver the rank-order to the CPR. If the parties have not themselves agreed upon an arbitrator and notified the CPR, the CPR shall notify the parties of the selection within five (5) Business Days of receipt of the rank-order preferences from each party. If none of the nominees is acceptable to a party, the procedure shall be repeated with a

17

new slate of nominees, and, if the parties cannot select the arbitrator the second time, the CPR shall select the arbitrator within five (5) Business Days of receipt of responses from each party to the second round.

Within five (5) Business Days after the designation of the arbitrator, the parties shall each submit a written statement of their respective positions on such disagreement to the arbitrator and one another. Each party shall have thirty (30) Business Days from receipt of the other party's submission to submit to the arbitrator and the other party a written response thereto, which shall include any scientific, technical and regulatory information in support thereof. The arbitrator shall have the right to meet with the parties, either alone or together, as necessary to make a determination. No later than thirty (30) Business Days after the designation of the arbitrator, the arbitrator shall make a determination by selecting the resolution proposed by one of the parties that the arbitrator deems as a whole to be the most fair and reasonable to the parties in light of the totality of the circumstances. The arbitrator shall provide the parties with a written statement setting forth the basis of the determination in connection therewith. The decision of the arbitrator shall be final and conclusive.

Unless otherwise agreed by the parties, all such arbitration proceedings will be held in New York, New York, provided that proceedings may be conducted by telephone conference call with the consent of the arbitrator(s). All arbitration proceedings will be conducted in the English language and the arbitrator will apply the law of New York. The arbitrator(s) will only have the authority to award actual money damages (with interest on unpaid amounts from the date due) and, except with respect to a breach or nonperformance of any provision of this Agreement relating to Confidential Information, the arbitrator will not have the authority to award indirect, incidental, consequential, exemplary, special, punitive or any other type of damages not measured by a party's compensatory damages, and the parties expressly waive any claimed right to such damages. The arbitration will be of each applicable party's individual claims only, and no claim of any other party will be subject to arbitration in such proceeding. The costs and expenses of the arbitration and the costs and expenses of the parties, will be paid by the losing party. If a party fails to proceed with arbitration, unsuccessfully challenges the arbitration award, or fails to comply with the arbitration award, the other party is entitled to costs, including reasonable attorneys' fees, for having to compel arbitration or defend or enforce the award. Except as otherwise required by law, the parties and the arbitrator will maintain as confidential all information or documents obtained during the arbitration process, including the resolution of the dispute. Judgment on the award granted in any arbitration hereunder may be entered in any court having jurisdiction over the award or any of the parties or any of their respective assets. The parties knowingly and voluntarily waive their rights to have their dispute tried and adjudicated by a judge and jury except as expressly provided herein.

(b) The provisions of Section 12.2(a) will not apply to any claim or controversy involving infringement or misappropriation of any Intellectual Property Right of a party. Nothing in this Section 12.2 will prevent a party from resorting to judicial proceedings if: (i) interim relief from a court is necessary to prevent serious and irreparable injury to such party; or (ii) litigation is required to be filed prior to the running of the applicable statute of limitations. The use of any alternative dispute resolution procedure will not be construed under the doctrine of latches, waiver or estoppel to affect adversely the rights of a party.

## 13. GENERAL

**13.1 Independent Contractors.** Each party represents that it is acting on its own behalf as an independent contractor and is not acting as an agent for or on behalf of any third party. This Agreement and the relations hereby established by and among Abeona and EBRP does not constitute a partnership, joint venture, franchise, agency or contract of employment. Neither party is granted, and neither party shall exercise, the right or authority to assume or create any obligation or responsibility on behalf of or in the name of any other party or such party's Affiliates. Each party shall be solely responsible for compensating all its personnel and for payment of all related workers' compensation, unemployment and withholding taxes. Neither party shall provide the other party's personnel with any benefits, including but not limited to compensation for insurance premiums, paid sick leave or retirement benefits.

**13.2 Force Majeure.** Except as otherwise provided in this Agreement, in the event that a delay or failure of a party to comply with any obligation created by this Agreement is caused by acts of God, wars (declared or undeclared and including the continuance, expansion or new outbreak of any war or conflict now in existence), revolution, civil commotion, acts of public enemy, labor strikes (other than employees of the affected party), terrorism, embargo or acts of government in its sovereign capacity (*"Force Majeure"*), the "affected party" will, after giving prompt notice to the "disadvantaged party(ies)," be excused from such performance on a day-to-day basis during the continuance of such prevention, restriction, or interference (and the disadvantaged party(ies) will likewise be excused from performance of its obligations on a day-to-day basis during the same period), provided, however, that the affected party will use its best efforts to avoid or remove the causes of nonperformance and all parties will proceed immediately with the performance of their obligations under this Agreement whenever the causes are removed or cease. If Force Majeure conditions continue for more than sixty (60) consecutive days or an aggregate one hundred twenty (120) days in any 12-month period, then the disadvantaged party may terminate this Agreement in accordance with Section 9.2(c).

**13.3 Assignment.** This Agreement will be binding on and inure to the benefit of the parties hereto and their respective successors and permitted assigns. No party may assign this Agreement or any of its rights under this Agreement nor delegate any of its obligations under this Agreement without the express prior written consent of the other parties; provided that each party may assign this Agreement without the consent of the other parties to an Affiliate or in connection with any merger, acquisition, or sale a majority of such party's voting stock or a sale of substantially all such party's assets; provided, further, that in each instance the assignee expressly assumes all obligations imposed on the assigning party by this Agreement in writing and each of the other parties is notified in advance of such assignment. Any purported assignment in violation of this Section 13.3 shall be null and void.

**13.4 Notices.** Unless otherwise provided herein, any notice, report, payment or document to be given by one party to another shall be in writing and shall be deemed given when delivered personally or mailed by certified or registered mail, postage prepaid (such mailed notice to be effective on the date which is three (3) Business Days after the date of mailing), or sent by nationally recognized overnight courier (such notice sent by courier to be effective one (1) Business Day after it is deposited with such courier), or sent by telefax (such notice sent by telefax to be effective when sent, if confirmed by certified or registered mail or overnight courier as aforesaid) to the address set forth on the signature page to this Agreement or to such other place as a party may designate as to itself by written notice to the other party.

**13.5 Applicable Law.** This Agreement shall be governed by, subject to, and construed in accordance with the substantive laws of New York without regard for any choice or conflict of laws rule or provision that would result in the application of the substantive law of any other jurisdiction.

**13.6 Waivers.** The waiver by a party of a breach or default under any provision under this Agreement or the failure of such party to exercise its rights under this Agreement in any instance shall not operate or be construed as a continuing waiver or a waiver of any subsequent breach or default. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar).

**13.7 Integration.** The terms and provisions contained in this Agreement (including the Attachments) constitute the entire understanding of the parties with respect to the transactions and matters contemplated hereby and supersede all previous communications, representations, agreements and understandings relating to the subject matter hereof. No representations, inducements, promises or agreements, whether oral or otherwise, between the parties not contained in this Agreement shall be of any force or effect. No agreement or understanding extending this Agreement or varying its terms shall be binding upon either party unless it is in a writing specifically referring to this Agreement and signed by a duly authorized representative of the applicable party. To the extent any terms or provisions of a Research and Development Plan conflict with the terms and provisions of this Agreement, the terms and provisions of

this Agreement shall control, except to the extent that the applicable Research and Development Plan expressly and specifically states an intent to supersede the Agreement on a specific matter.

**13.8 Severability.** In the event that any one or more of the provisions contained in this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement and such invalid or unenforceable provision shall be construed by limiting it so as to be valid and enforceable to the maximum extent compatible with, and possible under, applicable law.

**13.9 Binding Effect, Benefits.** This Agreement shall inure to the benefit of and be binding upon the parties and their respective successors and permitted assigns; nothing in this Agreement, expressed or implied, is intended to confer on any person or entity other than the parties hereto or, as applicable, their respective successors and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

**13.10 Headings.** The Section headings are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement

**13.11 Counterparts.** This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimile signatures shall be accepted as original signatures, orders may be transmitted electronically and any document created pursuant to this Agreement may be maintained in an electronic document storage and retrieval system, a copy of which shall be considered an original.

**13.12 Further Assurances.** Each party covenants and agrees that, subsequent to the execution and delivery of this Agreement and without any additional consideration, it will execute and deliver any further legal instruments and perform any acts which are or may become reasonably necessary to effectuate the purposes of this Agreement.

**13.13 Rules of Construction.** The parties agree that they have participated equally in the formation of this Agreement and that the language and terms of this Agreement shall not be construed against a party by reason of the extent to which such party or its professional advisors participated in the preparation of this Agreement.

**13.14 Word Meanings.** Words such as *herein*, *hereinafter*, *hereof* and *hereunder* refer to this Agreement as a whole and not merely to a section or paragraph in which such words appear, unless the context otherwise requires. The singular shall include the plural, and each masculine, feminine and neuter reference shall include and refer also to the others, unless the context otherwise requires.

**13.15 Competitive Activity.** Each party to this Agreement acknowledges and agrees that nothing in this Agreement shall restrict or prevent EBRP's ability to provide funding to, or take any other action with respect to, any Person that competes with a EvoDerm Product or the business, operations, and/or research of Abeona or EvoDerm; and each of Abeona and EvoDerm hereby waives any claim against EBRP with respect to any such competing activities. Abeona and EvoDerm agree that they shall conduct any research or development activities relating to Epidermolysis Bullosa solely through EvoDerm and shall cause any Affiliate to comply with the foregoing. It is understood and agreed that for purposes of this Section 13.15, the term "Affiliate" shall exclude any third party that becomes an Affiliate of EvoDerm after the Effective Date as a result of a transaction in which (i) such third party directly or indirectly acquires all or substantially all of the stock or assets of EvoDerm or (ii) EvoDerm is consolidated or merged into such third party or any of its affiliates; if the result of a transaction described in clause (i) or (ii) is that any "person" or "group" (within the meaning of Section 13(d) or 14(d) of the Securities Exchange Act of 1934, as amended) acquires, directly or indirectly, the beneficial ownership, of a majority of the voting power of EvoDerm and specifically excluding any person or group that is controlled directly or indirectly by EvoDerm or its present officers or directors; provided further, that with

20

respect to any such third party, the non-applicability of this Section 13.15 shall only take effect in the event and to the extent that those provisions would require such acquiring third party to cease activities that were being actively pursued prior to the date it becomes an Affiliate of EvoDerm. Each of Abeona and EBRP understands and agrees that the provisions of this Section 13.15 shall not be construed to release Abeona or EBRP from their obligations of confidentiality under Section 7 or from the obligations imposed upon their designated members of the EvoDerm Board of Directors under Delaware corporate law with respect to corporate opportunities.

Should the entity acquiring control of EvoDerm, or the affiliates of such entity, have a research and development program that is conducting a Phase II Clinical Trial or Phase III Clinical Trial or commercializing a product with a target product profile substantially equivalent to that of any Therapeutic Peptides or Products being actively developed by EvoDerm at that time (a "Competitive Program"), then, unless the Parties agree otherwise in writing, EvoDerm shall, within six (6) months after the date of the Change of Control, notify EBRP whether EvoDerm agrees to: (i) continue this Agreement, in which case EvoDerm shall commit resources to the development of the Selected DRPs, Therapeutic Peptides and Products at least equivalent to those previously planned to be committed by EvoDerm and at least equivalent to those committed at a comparable stage of development to the Competitive Program; or (ii) Abandon the EvoDerm Target; Should the Change of Control result, in EBRP's reasonable opinion, in a risk of sensitive commercial or technical information being disclosed to a competitor of EBRP, (1) the JPT, JRC and the PSC shall be dissolved, and (2) appropriate provisions shall be put in place to ensure that no sensitive commercial or technical information is disclosed to such competitor; and All other provisions of this Agreement, including those concerning the Co-Financing Option, the Co-Promotion Option, Development Milestones, Commercial Milestones, Royalties, Revenue Sharing and Partnering Arrangements shall continue to apply. For the avoidance of doubt, a Change of Control of EvoDerm shall not be considered to be a Partnering Arrangement.

*[remainder of this page intentionally left blank - signature page follows]*

IN WITNESS WHEREOF the parties have caused this Agreement to be executed on their behalf by their duly authorized representatives as of the Effective Date.

**ABEONA THERAPEUTICS INC.**

By: _____

Title:

**Notice Address**
Abeona Therapeutics Inc.
3333 Lee Parkway, Suite 600
Dallas, TX 75219
Attn: General Manager
Phone: 214.665.9495

With a copy to:
Jack Concannon, Esq.
Morgan, Lewis & Bockius LP
One Federal Street
Boston, MA 02210
Phone 617.951.8000

**EB RESEARCH PARTNERSHIP**

By: Alex Silver
Title: Chairman

**Notice Address**
EB Research Partnership

New York, NY 10017
Attn: Chief Executive Officer
Phone: 212.____.____

with a copy to:
Kenneth I. Schaner, Esq.
Schaner & Lubitz, PLLC
6931 Arlington Road, Suite 200
Bethesda, MD 20814
Phone: 240.482.2848

**EVODERM BIOPHARMA, INC.**

By: _____
Title:

**Notice Address:**
EvoDerm Biopharma, Inc.
6555 Carnegie Ave, Suite 401
Cleveland, OH 44103
Attn:

**Attachment 1**   Research and Development Plan
**Attachment 2**   Research and Development Plan Budget
**Attachment 3**   Stock Purchase Agreement
**Attachment 4**   Stock Issuance Agreement
**Attachment 5**   Voting Agreement
~~Attachment  6   Put and Call Agreement~~
**Attachment  6**7   Stanford License Agreement for EB 101
**Attachment 7**   Stanford License Agreement for EB 201~~s~~

22